IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ABDOU-MALIK YACOUBOU ADAM,

  *Plaintiff*,

  v.

  Civil Action No. ELH-09-2387

WELLS FARGO BANK, N.A.,

  *Defendant*.

**MEMORANDUM OPINION**

Plaintiff Abdou-Malik Yacoubou Adam, *pro se*, filed suit against Wells Fargo Bank, N.A. ("Wells Fargo"), defendant.[1]   In his Complaint (ECF 2), plaintiff set forth five claims arising from Wells Fargo's servicing of a mortgage on real property owned by Mr. Yacoubou,[2] located at 3805 Mayberry Avenue in Baltimore, Maryland (the "Property"), and sought $2 million in "compensatory damages."   On July 28, 2010, Judge J. Frederick Motz dismissed Count II of the complaint, which alleged discrimination on the basis of "race, national origin, and religion."   *See* Memorandum and Order (ECF 32 & 33).   Four counts remain: Count I ("Deception and contract violation"); Count III ("Libel and Slander"); Count IV ("Negligence");

---

[1] Plaintiff filed suit in the Circuit Court for Baltimore City.  Wells Fargo removed the case to this Court, based on diversity of citizenship.  *See* 28 U.S.C. §§ 1332(a) (original jurisdiction based on diversity); 1441(a)-(b) (removal jurisdiction).  Plaintiff is a resident of Maryland, while Wells Fargo is a national banking association that, for jurisdictional purposes, is a citizen of South Dakota, the state where its main office is located.  *See* 28 U.S.C. § 1348 (national banking associations are "deemed citizens of the States in which they are respectively located"); *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 307 (2006) (holding "that a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located").

[2] At his deposition on December 30, 2010 (ECF 50-2), plaintiff explained that Yacoubou is his "last name," but he did not object to opposing counsel addressing him as "Mr. Adam," because "Adam is easier." *Id.* at 6.  The Court will refer to Mr. Yacoubou by his surname.

and Count V, alleging "Strict Liability," which Judge Motz construed as a claim under the Fair

Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*.

The parties subsequently filed cross-motions for summary judgment (ECF 46 & 50). Mr.

Yacoubou has also filed a "Motion to Request a Speedy Jury Trial" (ECF 44).[3] All of the

motions have been fully briefed,[4] and no hearing is necessary to resolve them. *See* Local Rule

105.6. For the reasons that follow, I will grant in part, and deny in part, both parties' motions for

summary judgment, and will deny plaintiff's "Speedy Trial" motion.

## Background[5]

### A. Purchase and Refinancing of the Property

Plaintiff purchased the Property in January 2005, for $150,000, with financing from a

mortgage company that is not related to this case. *See* Deposition of Abdou-Malik Yacoubou

Adam ("Yacoubou Dep.") at 23, Ex.1 to Wells Fargo MSJ (ECF 50-2); *see also* SDAT Real

Property Record, Ex.2 to Wells Fargo MSJ (ECF 50-3). At the time of purchase, plaintiff

---

[3] In his opposition to Wells Fargo's motion for summary judgment, plaintiff indicates that he is "concerned about the implication of the sudden change of the Judge." The case was transferred to me in January 2011, in the ordinary course, after my appointment to the Court.

[4] In particular, the Court has considered Mr. Yacoubou's two motions ("Speedy Trial Motion" & "Yacoubou MSJ") (ECF 44 & 46); Wells Fargo's response in opposition to both motions ("Wells Fargo Opp.") (ECF 49); Wells Fargo's cross-motion for summary judgment ("Wells Fargo MSJ") (ECF 50-1); Mr. Yacoubou's combined reply and opposition to Wells Fargo's cross-motion ("Yacoubou Opp.") (ECF 53); and Wells Fargo's reply ("Wells Fargo Reply") (ECF 54).

[5] In considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party. *See, e.g.*, *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment is appropriate if the material facts are not disputed. *See, e.g.*, *Purdham v. Fairfax County Sch. Bd.*, 637 F.3d 421, 426 (4th Cir. 2011). In this section of the opinion, unless otherwise noted, I will set forth only facts on which the parties agree. In my discussion of the issues, I will present the facts in greater detail (elucidating, where applicable, the parties' disputes of fact).

intended to reside in the Property with his wife, as their primary residence.  Yacoubou Dep. at 26-27.  However, he and his wife separated shortly after the purchase, ultimately divorced, and never moved into the Property.  *Id.* at 27-35.  Although Mr. Yacoubou contemplated selling the Property, he decided instead to rent it to a tenant.  *Id.* at 29.

In October 2007, Mr. Yacoubou refinanced the Property, obtaining a loan of $212,000 from Gateway Funding Diversified Mortgage Services, L.P. ("Gateway").  To obtain the loan, Yacoubou submitted a "Uniform Residential Loan Application" (the "Application") to Gateway.  *See* Ex.19 to Wells Fargo MSJ (ECF 50-20).  In the Application, Yacoubou checked two boxes indicating that the Property would be his "Primary Residence."  *Id.* at 1, 3.  He also indicated that he was employed as a "Chemical Engineer" by "First Axis Engineering Services."  *Id.* at 1.  Under that loan, Mr. Yacoubou's total monthly payment was $1,652.50 (inclusive of principal, interest on the loan, and amounts to be escrowed for insurance and real estate taxes).  *Id.* at 2.

Gateway's loan was secured by a Deed of Trust on the Property.  *See* Deed of Trust, Ex.18 to Wells Fargo MSJ (ECF 50-19).   The Deed of Trust refers to Gateway as the "Lender," to Yacoubou as the "Borrower," and to the Deed of Trust as the "Security Instrument."  *Id.* at 1.  The following provisions of the Deed of Trust are relevant here, *id.* at 3-10:

> **1.    Payment of Principal, Interest, Escrow items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay for Escrow Items pursuant to Section 3.
>
> *            *            *
>
> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.

\* \* \*

**2.  Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due [for "Escrow Items" to cover taxes, assessments, ground rents, and insurance premiums] under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

\* \* \*

**3.  Funds for Escrow Items. . . .**  Lender may, at any time, collect and hold Funds [to pay for Escrow Items] in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under [the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*] and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

\* \* \*

If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify borrower as required under RESPA, and borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

\* \* \*

**6.  Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

\* \* \*

**8.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

\* \* \*

**16.  Governing Law . . . .**  This Security Instrument shall be governed by federal law and the law of the jurisdiction where the property is located.

\* \* \*

    **20. Sale of Note; Change of Loan Servicer . . . .** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change . . . .

### B. Mortgage Servicing by Wells Fargo

Shortly after execution of the Deed of Trust, Gateway notified Mr. Yacoubou that "the servicing of [his] loan, that is, the right to collect payments from [him]," had been transferred to "Wells Fargo Home Mortgage, Inc.,"[6] effective as of the monthly payment due on December 1, 2007. Notice of Assignment at 1, Ex.3 to Wells Fargo MSJ (ECF 50-4). It is undisputed that, through May 2008, Mr. Yacoubou sent monthly payments of $1,652.50 to Wells Fargo. Mr. Yacoubou did not timely make the payments due in June or July 2008, however. According to Mr. Yacoubou, he did not remit the payments because he disputed an increase in his monthly payment amount imposed by Wells Fargo during this time period.[7] *See* Yacoubou Dep. at 53.

The exact basis for the increase in the monthly payment amount is unclear from the record. Wells Fargo has produced a letter, which appears to be dated July 10, 2008, sent to Mr.

---

[6] The defendant is Wells Fargo Bank, N.A., not "Wells Fargo Home Mortgage, Inc." In correspondence to plaintiff, Wells Fargo Home Mortgage consistently identified itself as "Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.," and did not include an "Inc." after its name. Moreover, Wells Fargo Bank, N.A. is the entity that proposed a loan modification agreement with plaintiff, discussed *infra*. Defendant does not contend that "Wells Fargo Home Mortgage, Inc.," rather than Wells Fargo Bank, N.A., is the proper defendant. In the remainder of this opinion, I will refer to the "Wells Fargo" entities collectively as "Wells Fargo."

[7] If Mr. Yacoubou communicated his dispute to Wells Fargo during this time period, those communications are not contained in the record. Mr. Yacoubou has also asserted that he was experiencing financial difficulty during this time period because his tenant was not paying rent, and because of his divorce. *See* Yacoubou Dep. at 39.

Yacoubou from Wells Fargo's "Tax Department." Ex.4 to Wells Fargo MSJ (ECF 50-5).[8]  In the

letter, Wells Fargo informed Mr. Yacoubou that it had "changed [Yacoubou's] property tax

payment option from a semi-annual disbursement to an annual disbursement, based on

information from [his] local taxing authority." *Id.*  Specifically, the letter stated: "According to

your local taxing authority, the semi-annual disbursement option for paying property taxes is not

available to you, as the property is not recorded as your primary residence." *Id.*  The letter also

said: "Changing from semi-annual to annual disbursement could result in a change in your

monthly mortgage payment amount when your escrow account is analyzed." *Id.*  However, no

definite change in the monthly payment amount was set forth in the letter.

According to a much later letter, sent to Mr. Yacoubou on April 21, 2009, by a

representative of Wells Fargo, *see* Ex.7 to Wells Fargo MSJ (ECF 50-8), Wells Fargo had

performed an "escrow account analysis" on June 9, 2008, and "concluded that there was a

shortfall in the escrow account in the amount of $249.43." *Id.* at 2.  According to the April 2009

letter, as a result of this analysis, Wells Fargo recalculated Mr. Yacoubou's monthly payment at

$1,696.21, representing the original monthly figure of $1,652.50 plus $20.79 per month (*i.e.*, the

$249.43 "shortfall," divided over twelve months), and an additional $22.92 per month for

homeowner's insurance.[9]   *Id.* at 2.   The April 2009 letter also claimed that an "Escrow

Disclosure Statement and Notice of New Mortgage Payment" were sent to Mr. Yacoubou on

June 9, 2008, notifying him that, effective August 1, 2008, the new monthly payment would be

---

[8] The date of the letter is difficult to read because it is printed on top of Wells Fargo's logo in its letterhead.  According to Mr. Yacoubou, he received a similar letter around May 2008, but the May letter is not contained in the record.  *See* Yacoubou Dep. at 52-53, 72-74.

[9] The $22.92 figure represents the increase in Mr. Yacoubou's monthly homeowner's insurance payment, from $34.50 to $57.42.  *See* Wells Fargo MSJ, Ex.7 at 2.  The April 2009 letter did not explain the basis for the increase in the homeowner's insurance obligation.

$1,696.21.  *Id.*  The April 2009 letter also stated that another copy of that notice was "[e]nclosed."  *Id.*  However, the record does not contain a copy of the notice.

In any event, it is undisputed that Mr. Yacoubou did not timely send the monthly payments for June or July 2008.  On July 13, 2008, Wells Fargo sent a letter to plaintiff, indicating that his loan was "in default," and threatening acceleration of the mortgage and initiation of foreclosure proceedings unless the loan was brought current by August 12, 2008.  *See* Ex.8 to Wells Fargo MSJ (ECF 50-9).  In particular, Mr. Yacoubou was advised that his account was delinquent in the amount of $3,373.75 as of the letter's date.  *Id.*  That sum included $3,305 in "Past Due Payments" (*i.e.*, two monthly payments of $1,652.50) and $68.75 in late fees.  *Id.*  The July 2008 letter also indicated that an additional $1,696.21 was "due in the next 30 days," representing the payment due on August 1, 2008, at the new monthly rate.  To "avoid the possibility of acceleration," Mr. Yacoubou was told to pay a total of $5,069.96 (*i.e.*, $3,373.75 plus $1,696.21), no later than August 12, 2008.  *Id.*

Mr. Yacoubou sent Wells Fargo a payment of $500 on or about July 21, 2008.  *See* Bank Statement, Ex.9 to Wells Fargo MSJ (ECF 50-10).  According to the April 2009 letter, Wells Fargo credited that amount to late fees (the $68.75 mentioned in the July 2008 letter, plus an additional $137.50 in late fees), "[r]epayment of recoverable expense(s)" ($15.00), and "[d]eposit to escrow" ($278.75).  Wells Fargo MSJ, Ex.7 at 2.[10]

On or about September 10, 2008, Mr. Yacoubou paid $3,305 to Wells Fargo.  *See* Bank Statement.  According to a letter from a representative of Wells Fargo to the Better Business Bureau, dated July 8, 2009, submitted in response to a complaint filed by Yacoubou, Wells

---

[10] Plaintiff claims that, beginning around August 2008, he began telephoning Wells Fargo's customer service to attempt to work out a payment plan.

Fargo credited Mr. Yacoubou's payment of $3,305 to the mortgage payments due in June and July 2008. *See* Letter of July 8, 2009, Ex.6 to Wells Fargo MSJ (ECF 50-7).

On September 14, 2008, a few days after receiving Mr. Yacoubou's payment of $3,305, Wells Fargo sent him another letter, again indicating that his loan was "in default." Letter of Sept. 14, 2008, Ex.10 to Wells Fargo MSJ (ECF 50-11). According to the letter, Mr. Yacoubou's account was delinquent in the amount of $3,350.84. *Id.* The letter also stated that payment in the amount of $1,675.42 was "due in the next 30 days,"[11] and threatened acceleration of the mortgage and initiation of foreclosure proceedings unless Mr. Yacoubou paid a total of $5,026.26 (*i.e.*, $3,350.84 plus $1,675.42) by October 14, 2008. *Id.*

All of the correspondence from Wells Fargo described in the preceding paragraphs was addressed to Mr. Yacoubou at 831 Hilltop Road in Baltimore, Maryland. This was the address of a home owned by plaintiff's father-in-law, at which Mr. Yacoubou resided. *See* Yacoubou Dep. at 20-21.

On or about September 15, 2008, one day after its letter advising plaintiff of his default and demanding payment, Wells Fargo sent Mr. Yacoubou a Notice of Intent to Foreclose ("Notice"), pursuant to Md. Code (2010 Repl. Vol., 2010 Supp.), § 7-105.1 of the Real Property Article. *See* Notice of Intent to Foreclose at 2, Ex.2 to Yacoubou Opp. (ECF 53-3). It asserted

---

[11] The sum of $1,675.42 is half of $3,350.84. It appears that the sum of $3,350.84 represented unpaid monthly payments of $1,675.42 for August and September 2008, and that the additional $1,675.42 "due in the next 30 days" was the monthly payment for October 2008. Nothing in the record clearly states how or when the figure of $1,675.42 was calculated; it differs from Mr. Yacoubou's original monthly payment of $1652.50 and from the monthly rate of $1,696.21 that the April 2009 letter asserted was effective as of August 2008. Notably, it is $22.92 more than $1,652.50, which suggests that it represents the original monthly payment plus the increased monthly payment for insurance, but without an additional payment for the escrow "shortfall." *See* note 9 and accompanying text, *supra*.

that Mr. Yacoubou's "mortgage loan payment [was] currently 44 days past due and [was] in default." *Id.* at 2.  According to the Notice, the "Date of [Yacoubou's] Last Payment" was June 1, 2008, and he owed a total of $3,335.84.  *Id.*   The Notice also advised that Yacoubou could "avoid foreclosure" by paying that sum, "plus any additional payments, late charges, fees, penalties, or costs that may be due after the date of this notice" by October 30, 2008.  *Id.*  The Notice was sent to the Property, rather than to the Hilltop Road address, where earlier correspondence had been sent.  *Id.* at 1.

On October 9, 2008, Mr. Yacoubou sent a check to Wells Fargo in the amount of $1,652.50.  Wells Fargo returned the check to Yacoubou on October 14, 2008, explaining that "the funds do not represent the total amount due to reinstate the account.  As of this date, there are no written arrangements agreeing to accept the enclosed funds."  Ex.11 to Wells Fargo MSJ (ECF 50-12).

On October 23, 2008, Mr. Yacoubou wrote to Wells Fargo's customer service department, asserting that, in its Notice, Wells Fargo had "deliberately changed the last payment date from 9/10/2008 [*i.e.*, the date of his $3,305 payment] to 7/1/2008 and sent the notice to the address that is different from the one it uses for the bills."  Letter of Oct. 23, 2008 at 1, Ex.1 to Yacoubou Opp. (ECF 53-2).  Yacoubou explained that he had experienced financial difficulty due to his tenant's failure to pay rent (and ultimate eviction, leaving the Property empty for three months while Yacoubou searched for a new tenant), and his divorce (including that his spouse was "getting half of [his] income for child support").  *Id.*  He also claimed that he called Wells Fargo in August 2008 to attempt to work out a payment plan, but was rebuffed.  *Id.*  Yacoubou

asserted: "Wells Fargo has refused to have meaningful talk[s] with me on the one hand, and on the other keeps harassing me with recorded phone calls." *Id.* Further, Mr. Yacoubou stated, *id.*:

> Taking advantage of my financial situation, Wells Fargo has added $22.92 to the monthly payment saying that my property was not recorded as [a] primary residence and that is a lie. Recorded as my primary residence, that property is where I was supposed to be living with my family until the woman changed her mind forcing me to rent it. I will never pay for this increase of exploitation base[d] on [a] lie.
>
> &ast; &ast; &ast;
>
> The monthly payment I signed for was and is still $1,652.50 and now Wells Fargo is asking for $1,675.42 with no proof or good reason. On July 13, 2008 letter [sic], I owed $3,305.00 and on July 22, 2008 Wells Fargo cashed $500.00, where did that money go when I sent it in good faith to reduce the mortgage? Since I reject this exploitation and cheating, Wells Fargo has returned my payment of $1,652.50 in order to foreclose the property. Wells Fargo has planned to get the house back giving the impression that I refuse to pay for 90 days.

## C. The Loan Modification Agreement

Apparently as a result of Mr. Yacoubou's October 2008 letter, Wells Fargo proposed a modification of Yacoubou's loan. On November 3, 2008, Wells Fargo sent Yacoubou a letter to "confirm [Wells Fargo's] formal approval of a loan modification/restructure of [Yacoubou's] mortgage loan," along with a "Loan Modification Transmittal Form" and a proposed "Loan Modification Agreement (the "Modification"). *See* Ex.12 to Wells Fargo MSJ (ECF 50-13). The letter asked Yacoubou to "sign the enclosed loan modification agreement and return it." It also stated: "This proposal is valid for five (5) days from the date of this letter."

The Modification contained two blank signature lines, one for Yacoubou and one for "Wells Fargo Bank, N A, Officer." *Id.* Yacoubou signed the Modification on November 10, 2008, and returned it to Wells Fargo.[12] *See id.* However, the record does not contain a copy

---

[12] In a subsequent letter to Wells Fargo, Yacoubou asserted that he received the

reflecting that it was signed by a representative of Wells Fargo.  As I discuss, *infra*, whether the Modification took binding effect is of critical importance for resolution of the parties' dispute.

The Modification applied to certain "terms of the Security Instrument."  *Id.* at 4.  In particular, Mr. Yacoubou's loan was to be restructured by extending the term, adjusting the principal, and lowering the interest rate.  *See id.*  As of the date of the Modification, Mr. Yacoubou's principal balance was $210,510.68.  *See id.* at 2.  Pursuant to the Modification, approximately $9,500 in interest, "[e]scrow" payments, and other fees were to be capitalized and added to the principal.  *Id.*  The Modification also "extended" the "first . . . contractual due date" from August 1, 2008 (*i.e.*, the date from which no monthly payment had been accepted by Wells Fargo) until January 1, 2009.  *Id.* at 3.  In addition, Mr. Yacoubou's total monthly payment was set at $1,357.74, representing a monthly principal and interest payment of $1,024.53, plus a monthly escrow payment of $333.21.  *Id.* at 1.  (As noted, Yacoubou's total monthly payment originally was $1,652.50.)  Under the Modification, Yacoubou's interest rate was lowered from 6.75% to 4.75%.  *Id.* at 2.

Further, the Modification contained a section titled "CORRECTION AGREEMENT," initialed by Yacoubou, which stated, *id.* at 4 (emphasis added):

> The undersigned borrower(s), for and in consideration of the approval, closing and funding of this Modification, hereby grants Wells Fargo Bank, N A, as lender, limited power of attorney to correct and/or initial all typographical or clerical errors discovered in the Modification Agreement required to be signed. . . . *This provision may not be used to modify the interest rate, modify the term, modify the outstanding principal balance or modify the undersigned's*

---

Modification on November 10, 2008, and signed it "the same night and sent [it] back the next day."  Yacoubou Opp., Ex.4 at 1 (ECF 53-5).  Wells Fargo does not contend that the Modification was invalid due to Yacoubou's acceptance of it on November 10, 2008, more than five days after November 3.  *See* Wells Fargo MSJ at 6-11.

>*monthly principal and interest payments as modified by this agreement. Any of these specified changes must be executed directly by the undersigned.*

Finally, the Modification stated that, "except as otherwise specifically provided in this Agreement, the Note and mortgage will remain unchanged, and borrower and lender will be bound by, and shall comply with, all of the terms and provisions thereof, as amended by this Agreement." *Id.*

Wells Fargo asserts that it sent another proposed modification agreement to Yacoubou on or about November 28, 2008. Wells Fargo MSJ at 5. At his deposition in December 2010, Mr. Yacoubou claimed that he never received the second modification offer. *See* Yacoubou Dep. at 107-08. Nor is the second modification offer contained in the record.

Wells Fargo explains that the second modification was sent to plaintiff after the defendant "determined that there was a minor error in the monthly payment calculation" set forth in the Modification. It characterizes its November 28, 2008 transmission as a "revised and finalized . . . modification offer." Wells Fargo MSJ at 5. *See also* Wells Fargo MSJ, Ex.7 at 4 (April 2009 letter to Yacoubou, asserting that, "[o]n November 28, 2008, new modification terms were finalized," and that, "[a]s a result of the new modification agreement established on November 28, 2008, the modification agreement dated November 3, 2008 was nullified"). According to Wells Fargo, the "only difference between the initial and finalized modification offers [was] that the Plaintiff's monthly payment would be seven cents more ($1,357.81 rather than $1,357.74)" under the November 28 offer.[13] Wells Fargo MSJ at 5.

---

[13] According to Wells Fargo's April 2009 letter to Yacoubou, the difference in the monthly payment amount was the result of a $15 difference in the amount of principal, attributed to the fact that the November 28 offer did not "reduce the modified unpaid principal balance by the recoverable expense credit." Wells Fargo MSJ, Ex.7 at 4.

In a letter to Wells Fargo dated January 31, 2009, plaintiff asserted that he received what appeared to him to be another "copy of the same contract" that he had already signed. Yacoubou Opp., Ex.4 at 1 (ECF 53-5); *see also* Yacoubou Dep. at 109 ("It's the same."). In his letter, plaintiff recounted that he spoke with a representative of Wells Fargo by telephone on December 18, 2008.[14] He stated, Yacoubou Opp., Ex.4 at 1:

> [T]he representative was named Marta or Margaret . . . . She wanted to know if I received the contract, and I said yes. Then she said there was a second contract that I had to sign and send to Wells Fargo. I told her in fact there was no second contract because I just had a copy of the same contract sent again. I asked her if Wells Fargo received the contract that I signed. She said she did not know. Then I requested to talk to her Supervisor. She answered that the Supervisor was busy and that she would make a note that I did not have a new contract and that her Supervisor would give me a call later (he never called).

Yacoubou also mentioned this phone call at his deposition in December 2010. Yacoubou testified that he asked the Wells Fargo representative to fax a copy of the second Modification to him. However, she refused to do so, or "wouldn't answer." Yacoubou Dep. at 108-09.

On January 6, 2009, having not received further communication from Wells Fargo or a confirmation regarding the loan modification, Mr. Yacoubou sent Wells Fargo a check for $1,357.74, the monthly payment specified in the Modification. *See* Ex.14 to Wells Fargo MSJ (ECF 50-15); *see also* Yacoubou Opp., Ex.4 at 1. On January 15, 2009, Wells Fargo sent Yacoubou a letter stating: "[W]e must advise you your request for Loan Modification has been denied for the following reason(s): We are unable to come to a mutual agreement regarding your request for a workout." Ex.13 to Wells Fargo MSJ (ECF 50-14). On January 19, 2009, Wells

---

[14] In his January 2009 letter, Yacoubou asserted that the Wells Fargo representative called him. *See* Yacoubou Opp., Ex.4 at 1. In contrast, at his deposition, he asserted: "I'm the one who called them." Yacoubou Dep. at 108. The discrepancy is not material.

Fargo returned Yacoubou's $1,357.74 check to him, again stating that "the funds do not represent the total amount due to reinstate the account." Ex.14 to Wells Fargo MSJ.

On or about February 9, 2009, Mr. Yacoubou sent Wells Fargo a check for $2,715.48 (*i.e.*, two monthly payments of $1,357.74). *See* Ex.6 to Yacoubou Opp. (ECF 53-7). Again, on February 13, 2009, Wells Fargo returned the check to Yacoubou, stating that it was insufficient "to reinstate the account." *Id.* The February 2009 check was Mr. Yacoubou's last attempt to send payment to Wells Fargo.[15]

### D.  Foreclosure Proceedings and Initiation of This Litigation

On April 8, 2009, Wells Fargo, through substitute trustees, initiated a foreclosure action against Mr. Yacoubou in the Circuit Court for Baltimore City, captioned *Buonassisi v. Yacoubou Adam*, Civ. No. 24-O-09-001553 ("*Buonassisi I*"). *See Buonassisi I* Case Search Docket, Ex.15 to Wells Fargo MSJ (ECF 50-16). A foreclosure sale of the Property was scheduled for July 28, 2009. *See* Ex.5 to Yacoubou Opp. (ECF 53-6). However, on June 15, 2009, Mr. Yacoubou filed a motion to enjoin the foreclosure sale. *See Buonassisi I* Case Search Docket. According to Wells Fargo, Mr. Yacoubou also "threatened litigation." Wells Fargo MSJ at 5. On June 18, 2009, before the circuit court ruled on Mr. Yacoubou's motion, Wells Fargo's substitute trustees voluntarily dismissed *Buonassisi I*. *See id.*; *see also Buonassisi I* Case Search Docket.

---

[15] As an exhibit to his motion papers, Mr. Yacoubou has submitted an audio cassette that appears to be a recording of a telephone conversation between Yacoubou and a representative of Wells Fargo. Wells Fargo has not contested the authenticity or admissibility of the recording. Assuming its authenticity, Yacoubou states in the recording that the date of the call was February 5, 2009. Yacoubou's statements to the Wells Fargo representative are consistent with his assertions in the contemporaneous correspondence he has submitted. However, the content of the call is not relevant to the issues before the Court.

On July 28, 2009, Mr. Yacoubou filed his complaint in the case *sub judice*. The next day,

Ashley Kenney, an employee of the law firm representing the substitute trustees in *Buonassissi I*,

wrote to Yacoubou, offering on behalf of Wells Fargo to "honor" the Modification. *See* Kenney

Letter, Ex.16 to Wells Fargo MSJ (ECF 50-17). Ms. Kenney wrote, *id.*:

> This letter is to inform you that Wells Fargo Bank, N.A. will honor the 11/3/2008 loan modification agreement conditioned on you bringing the arrears current no later than September 1, 2009. Please contact us as soon as possible to arrange for payment of the arrearage. You will need to pay $12,144.66 to pay your arrearages in full and bring your loan current by September 1, 2009. (This amount was calculated based on nine (9) payments of $1,357.74 that will be due as of September 1, 2009 equaling $12,219.66. You were given a credit of $75.00 towards this arrearage bringing your total balance to $12,144.66).

Mr. Yacoubou rejected Wells Fargo's offer, and this litigation continued. *See* Yacoubou

Dep. at 152. On October 2, 2009, after removing the case to federal court, Wells Fargo filed a

motion to dismiss Counts II and V of plaintiff's complaint, which allege, respectively,

discrimination (on the basis of race, national origin, and religion) and "strict liability" (ECF 12).

On October 7, 2009, Mr. Yacoubou filed a motion asking the court to order the issuance of a

subpoena to Wells Fargo to release recordings of two telephone calls, one on December 18,

2008, and the other on January 12, 2009, between Yacoubou and representatives of Wells Fargo

(ECF 13). Both motions were fully briefed by the parties. In particular, Wells Fargo opposed

plaintiff's motion (ECF 17) on the ground that no scheduling order had yet been issued, and thus

any discovery was premature under Local Rule 104.4, which provides that, ordinarily,

"discovery shall not commence and disclosures need not be made until a scheduling order is

entered." Wells Fargo also noted that, after discovery commenced, plaintiff would be able to

obtain a subpoena, or obtain the recordings by a request for production of documents, without a

court order.

On July 28, 2010, Judge Motz issued a Memorandum Opinion and Order (ECF 32 & 33) granting in part and denying in part Wells Fargo's motion to dismiss.  Specifically, Judge Motz dismissed Count II (the discrimination claim), but denied Wells Fargo's motion to dismiss Count V.  As noted, Judge Motz construed Count V of plaintiff's *pro se* complaint to allege a cause of action under the FDCPA.   Judge Motz also denied Yacoubou's motion for issuance of a subpoena.  The same day, Judge Motz issued a Scheduling Order (ECF 34), allowing discovery to commence.

Meanwhile, on March 4, 2010, the substitute trustees initiated another foreclosure proceeding against Mr. Yacoubou in the Circuit Court for Baltimore City, captioned *Buonassissi v. Yacoubou Adam*, Civ. No. 24-O-10-000968 ("*Buonassissi II*").  *See Buonassissi II* Case Search Docket, Ex. 17 to Wells Fargo MSJ (ECF 50-18).  According to the unofficial docket printed from the Maryland Judiciary's "Case Search" website, submitted as an exhibit by defendant, *id.*, on April 14, 2010, in the *Buonassissi II* litigation, Mr. Yacoubou filed a "Motion to Dismiss Docket: For Federal Court Supersedes State Courts and Case Under Litigation in Federal Court."  On July 20, 2010, the circuit court (Pierson, J.) denied the motion.  *Id.*  Yacoubou filed a notice of appeal on August 19, 2010.  *Id.*  Then, on August 21, 2010, he filed a motion seeking "injunctive relief to block the dismissal order issued on 20 July 2010 pending appeal."  *Id.*  The circuit court denied the motion for "injunctive relief" on August 24, 2010.  *Id.*

Mr. Yacoubou's appeal was docketed in the Maryland Court of Special Appeals as Case No. 1407, September Term 2010.  *Id.*  It is currently pending in that court.  According to the docket sheet for the *Buonassissi II* litigation, no further substantive activity has occurred in that case since August 2010.  Moreover, Wells Fargo observes: "No foreclosure sale has occurred."

Wells Fargo MSJ at 6.

Additional facts will be presented in the discussion.

**Discussion**

A.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.[16]  Under Rule 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party

---

[16] Rule 56 was amended, effective December 1, 2010.  The amended rule governs the motions at bar, the first of which was filed on February 9, 2011.

Under former Rule 56, the non-moving party was granted 21 days to respond to a motion for summary judgment.  As amended, Rule 56 no longer contains any provision setting the response time.  Thus, the non-moving party's time to respond to a motion for summary judgment is now established by Local Rule 105.2(a), which sets a deadline of 14 days after service to respond to any motion, unless the court orders otherwise.  Ordinarily, motions in this court are served either by CM/ECF or by U.S. mail, and thus Rule 6(d) operates to add another three days to the deadline set by Local Rule 105.2(a), making the deadline 17 days from the date of service. *See* Fed. R. Civ. P. 6(d) (adding 3 days to any time period for a response that is measured from the date of service, if service is made electronically or by mail).

In this case, plaintiff filed and served his motion for summary judgment on February 9, 2011.  Wells Fargo did not respond to plaintiff's motion for summary judgment until March 7, 2011, which was more than 17 days after the date plaintiff's motion was served.  However, Wells Fargo's response would have been timely under former Rule 56, which had only recently been amended. *See also* Fed. R. Civ. P. 6(a)(1)(C), (d).  In any event, plaintiff has not objected to Wells Fargo's late filing.

opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003).[17]  "Both motions must be denied if the court finds that there is a genuine issue of material fact.  But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2010 Supp.).

---

[17] In this case, Wells Fargo has filed an opposition to plaintiff's motion for summary judgment (ECF 49), and has also filed its own motion for summary judgment (ECF 50). However, as plaintiff aptly observes, "both have the same contents."  Yacoubou Opp. at 1.  The only differences between Wells Fargo's filings are a few non-substantive rhetorical flourishes. Accordingly, I will draw from Wells Fargo's motion for summary judgment to present its contentions in opposition to plaintiff's motion and in support of its own.

As noted, plaintiff is proceeding *pro se*. Accordingly, his filings will be "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted).

## B.  Governing Law

Plaintiff's complaint raises claims that sound in contract and in tort (which generally are matters of state law), as well as claims that implicate substantive federal statutes. As to the federal statutory issues, federal law controls. *See, e.g.*, *United States v. Midgett*, 198 F.3d 143, 145 (4th Cir. 1999) (articulating "general principle 'that federal law governs the application of Congressional statutes in the absence of plain language to the contrary'"); *Asheville Tobacco Bd. of Trade, Inc. v. FTC*, 263 F.2d 502, 508 (4th Cir. 1959) ("The interpretation of a federal statute is peculiarly the function of the federal courts."). As to the issues of state law, this Court "must apply the substantive law of the forum state including its choice of law rules." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). Here, the forum state is Maryland.

In matters regarding the interpretation of contracts, Maryland applies *lex loci contractus*, *i.e.*, the law of the place where the contract was made, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *accord Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 302-03 (4th Cir. 2002). In this case, the Deed of Trust provides that it "shall be governed by federal law and the law of the jurisdiction where the property is located." Deed of Trust § 16. This provision was not altered by the Modification. Accordingly, because the Property is located in Maryland, I will apply Maryland law in addressing the parties' contractual disputes.

With respect to tort claims, Maryland applies *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm." *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).   Because the alleged harm occurred in Maryland, I will apply Maryland law with respect to the analysis of plaintiff's tort claims.

<u>C.  "Deception and Contract Violation" (Count I)</u>

Count I of plaintiff's complaint raises a variety of alleged breaches of Wells Fargo's contractual duties.  In addition to addressing Yacoubou's individual arguments, Wells Fargo asserts two broad defenses to Yacoubou's claims of breach: (1) that Yacoubou cannot prove any consequential damages; and (2) that Yacoubou's claims are barred by his own breaches of contract.

Plaintiff's primary grievance appears to be Wells Fargo's refusal to accept his mortgage payments in January and February 2009, pursuant to the Modification.   Plaintiff asserts that, by rejecting his payments, "Wells Fargo rejected its own written contract."  Complaint ¶ 21.  In his "Motion for Final Summary Judgment," plaintiff contends that Wells Fargo's rejection of these payments constituted a "breach of Contract."   Moreover, Yacoubou claims that Wells Fargo "admitted" its breach in July 2009, when the substitute trustees agreed, after plaintiff initiated this suit, to honor the Modification, even though "the Defendant had declared [it] 'Null and Void' since December 2008."  Yacoubou MSJ at 2 (emphasis omitted).

In response, Wells Fargo insists that it, and not Yacoubou, is entitled to summary judgment on this issue.  Citing to a passage from its deposition of Yacoubou, Wells Fargo suggests that, "[i]ronically," Mr. Yacoubou "now takes the position that the initial modification offer is 'null and void' and that he does not want to follow the terms of the November 3, 2008

modification offer."  Wells Fargo MSJ at 8.  It argues: "It would be illogical to sustain a breach of contract action based on a contract the Plaintiff believes is unenforceable and which he has no desire to enforce."  *Id.* at 8-9.

At his deposition, Yacoubou seemed to believe that the Modification was not viable.  The relevant portion of the deposition is as follows, Yacoubou Dep. at 152-155 (boldface in original):

> **[Wells Fargo's Counsel:]    Now, do you recall what was your response to [the substitute trustees'] offer to honor the 11-3, 2008 loan modification agreement?**
>                                              *    *    *
> [Yacoubou:]   I said no because they had their chance.  Why did we have to go through this torture first?  Why do they have to torture me for eight months, nine months, and they're ready to sell the house, and till now we're in court, I'm filing against them, and now they're coming back?  What about all the wrongdoing, all the wrong done to me?
>
> **Q      As I understand it, your complaint was that Wells Fargo would not honor the November 3rd, 2008 agreement, and on July 29th, 2009, which was more than a year and several months ago, [the substitute trustees'] office was indicating that Wells Fargo would honor that agreement.  What was your reason for not wanting to go ahead?**
>
> A      You have to ask them what is their reason for rejecting their own contract that they wrote.  It's not me.  I'm not the problem here.
>
> **Q      Are you claiming there is no contract at this point?**
>
> A      Who wrote the contract?  Who sign it?  Who refuse it?
>
> **Q      Are you claiming in this case at this point that there is no contract dated 11-3, 208 between yourself and Wells Fargo?**
>
> A      Well, I have to call Wells Fargo.  Wells Fargo says it's null and void.
>
> **Q      So what is your position?**
>
> A      I'm not an English speaker.  Null and void.  You are a lawyer. You understand it better than me.

> **Q**      **I'm not asking what you say Wells Fargo's position was prior to July 29th, 2009.  I'm asking you what your position is.**
>
> A      Wells Fargo's position is the most important in this matter.
>
> **Q**      **What is your position, Mr. Adam?**
>
> A      If I will say it's null and void, I agree with Wells Fargo it's null and void.
>
> **Q**      **Okay.  You agree it's null and void.  So if the modification agreement dated November 3rd, 2008 is null and void, then you would be bound by the original terms of your loan?**
>
> A      My question is so if the original term was working, why would I go about a modification?
>
> **Q**      **Because you asked for one.**
>
> A      At first didn't ask.  Later on they offer.  They offer because the lie couldn't sustain.
>
> *      *      *
>
> **Q**      **So at this point in time you no longer want to follow the terms of the November 3rd, 2008 modification?**
>
> A      There's nothing to follow.  That's why we're in court.
>
> **Q**      **I'm just asking do you or do you not want to follow the terms of the November 3rd, 2008 agreement?**
>
> A      Why do I have to follow something that is dead?  Why would you follow something that is dead?
>
> **Q**      **Do you or do you not want to follow the terms of the November 3rd, 2008 agreement?**
>
> A      I can't follow something that is dead.  Nothing that does not exist, I don't see how I can follow that.

In the above-quoted exchange, Yacoubou expressed his belief that Wells Fargo had repudiated the Modification, and that, *because of that repudiation*,  it was no longer binding on him.  In my view, that is not equivalent to a claim by plaintiff that the Modification was invalid

from its inception.   Nor does it preclude a determination that Wells Fargo breached the Modification.

In its briefing, Wells Fargo makes no attempt to argue that the Modification was legally invalid.   Indeed, in July 2009, in the Kenney Letter, Wells Fargo expressed its willingness to "honor" the Modification.   Yet, Wells Fargo seems to assume that the Modification did not take effect.   For instance, it consistently describes the Modification as an "initial modification offer," and suggests that Yacoubou "apparently refused to entertain the revised modification offer" that it allegedly sent on November 28, 2008.   Wells Fargo MSJ at 8.   Wells Fargo also asserts that Yacoubou "is in arrears dating back to September of 2008," *id.* at 10, which implies that the Modification never took effect, because Yacoubou's first payment under the Modification was not due until January 2009.

As I see it, I cannot resolve on this record, as a matter of law, whether the Modification took binding effect.   Thus, as I explain below, I cannot grant either party's motion for summary judgment as to Wells Fargo's liability for breach of contract (Count I).

As noted, the letter attached to the Modification stated that it would "confirm our formal approval of a loan modification," and simply asked Yacoubou to "sign the enclosed loan modification agreement and return it."   Notably, the Modification contained blank signature lines for both Yacoubou and an officer of Wells Fargo.   In *Azimirad v. HSBC Mortgage Corp.*, Civ. No. DKC-10-2853, 2011 WL 1375970 (D. Md. April 12, 2011), Chief Judge Deborah Chasanow recently discussed, under Maryland law, the uncertain effect of a blank signature line in a proposed contract.   In that case, a mortgage servicer, HSBC, sent a proposed loan modification to the mortgagor, Azimirad, who signed and returned it.   *See id.*, 2011 WL 1375970 at *1.

Thereafter, Azimirad sought to comply with the modification, but "he received a variety of answers from HSBC; one representative told him that HSBC planned to honor the Agreement, while another told him that the Agreement would need to be modified on different terms." *Id.* Azimirad sued HSBC, asserting breach of contract and other theories. *Id.* at *2. HSBC moved to dismiss on the ground that the loan modification agreement did "not bear a signature from HSBC," reasoning "that the absence of its signature means there is not a binding contract." *Id.* at *3. Rejecting HSBC's argument, Judge Chasanow reasoned, *id.* at *3-4:

> Generally speaking, "a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract." *Porter v. Gen. Boiler Casing Co., Inc.*, 284 Md. 402, 410, 396 A.2d 1090 (1979); *see also Tow v. Miners Mem'l Hosp. Ass'n*, 305 F.2d 73, 75 (4th Cir. 1962) ("If a person has accepted a written agreement and has acted upon it he is bound by it, although he may not have set his hand to the document."). "There is an exception to this rule, however, when the terms of the contract make the parties' signatures a condition precedent to the formation of the contract." *All State Home Mortg., Inc. v. Daniel*, 187 Md. App. 166, 181, 977 A.2d 438 (2009).[18]  Even when there is no signature requirement in the explicit terms of the contract, other evidence might be used to establish that such signatures were meant to be a condition precedent. *Id.* (citing *Pradhan v. Maisel*, 26 Md. App. 671, 677-78, 338 A.2d 905 (1975)).

> HSBC argues that its signature was a condition precedent to the Loan Modification Agreement. Notably absent from the contract is any explicit statement that HSBC signature's was in fact such a condition. *Compare All State*, 187 Md. App. at 183, 977 A.2d 438 (finding signatures were condition precedent where contract stated that "[t]his agreement is effective and binding . . . when both parties sign it"); *see also Chiricella v. Erwin*, 270 Md. 178, 182, 310 A.2d 555 (1973) (describing words and phrases indicating express condition precedent). Nevertheless, HSBC maintains that the condition can be inferred [because] the Loan Modification Agreement contained a line for HSBC to sign as "Lender." Courts, however, have seemed generally unwilling to infer a condition precedent from a signature line alone. *See, e.g., Shovel Transfer & Storage, Inc.*

---

[18]  In a footnote, Judge Chasanow explained that a "'condition precedent in a contract is a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises.'" *Azimirad*, 2011 WL 1375970, at *3 n.2 (quoting *All State*, 187 Md. App. at 182, 977 A.2d 438).

*v. Pa. Liquor Control Bd.*, 559 Pa. 56, 66, 739 A.2d 133 (1999) ("[T]he mere
presence of signature lines does not determine whether the parties intended to be
bound only upon the execution of the document by all the signatories."); *Allen v.
Ford Motor Credit Co.*, 8 F. Supp. 2d 702, 705 (N.D. Ohio 1998) (noting
signature spaces are generally insufficient to establish condition precedent); *In re
Marriage of Hasso*, 229 Cal. App. 3d 1174, 1181, 280 Cal. Rptr. 919 (1991)
(finding attorney approval was not condition precedent to enforcement of
settlement agreement, despite presence of signature line for attorney); *Ampex
Credit Corp. v. Bateman*, 554 F.2d 750, 752 (5th Cir. 1977) (stating that blank
signature lines do not conclusively establish condition precedent); *see also* 17A
Am. Jur. 2d Contracts § 175 (2010 supp.) ("Signature spaces in a form contract do
not in and of themselves require that signatures of the parties are a condition
precedent to the agreement's enforceability.").

*   *   *

At bottom, "[t]he determination of whether a provision in a contract
constitutes a condition precedent is a question of construction dependent on the
intent of the parties." *N.Y. Bronze Powder Co., Inc. v. Benjamin Acquisition
Corp.*, 351 Md. 8, 14 n. 2, 716 A.2d 230 (1998). Where, as here, "ambiguity is
found in a contract, it becomes a question of fact to decipher the intent of the
parties in forming the instrument." *City of Bowie v. Mie* [*Properties, Inc.*, 398
Md. 657,] 684 n. 16 (2007).

Here, as in *Azimirad*, there is no language in the Modification indicating that Wells

Fargo's signature was a condition precedent.  The cover letter and the Modification do not

contain language indicating that Wells Fargo's offer was conditional, or that any steps needed to

be taken by Yacoubou to make the Modification effective, other than signing and returning it, as

directed.  As *Azimirad* indicates, however, the presence of the signature line for Wells Fargo

renders the Modification ambiguous.  Whether Wells Fargo's signature was a condition

precedent is a question of fact that neither party has addressed.  A fact finder could conclude

that, by signing the Modification and delivering it to Wells Fargo, Yacoubou accepted Wells

Fargo's offer, creating a new contractual relationship between the parties.  *See Cochran v.

Norkunas*, 398 Md. 1, 24-25 919 A.2d 700 (2007) ("'The well established rule is that in the

absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is

complete and the contract becomes binding upon both parties when the offeree deposits the acceptance in the post box.'") (citation omitted).  Conversely, a fact finder could determine that the Modification was not binding until signed by an authorized representative of Wells Fargo.

If the Modification formed a binding contract, to the extent that Wells Fargo miscalculated the amount of principal in the Modification (the alleged basis for Wells Fargo's second modification offer, purportedly sent on November 28, 2008), the miscalculation would be a unilateral mistake on the part of Wells Fargo.  Maryland law "'is clear that, absent intentional, culpable conduct, such as fraud, duress or undue influence, a unilateral mistake is ordinarily not a ground for relief from a contract.'"  *Nationwide Mut. Ins. Co. v. Voland*, 103 Md. App. 225, 234 (1995) (quoting *Creamer v. Helferstay*, 294 Md. 107, 121 (1982)).

Assuming, *arguendo*, that the Modification took binding effect, it was Wells Fargo, and not Yacoubou, that breached, by refusing to accept the monthly payments tendered by Yacoubou in January and February 2009, pursuant to the Modification.  "The hindrance by one contracting party which impedes or prevents performance by the other constitutes a breach."  *Farmer v. Jamieson*, 31 Md. App. 37, 44-45, 354 A.2d 225, 230 (1976) (citing *Funger v. Mayor of Somerset*, 249 Md. 311, 330, 239 A.2d 748 (1968)); *accord Dexter v. Dexter*, 105 Md. App. 678, 684-85, 661 A.2d 171, 174, *cert. denied*, 341 Md. 27, 668 A.2d 36 (1995); *see also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 690 (7th Cir. 2011) (reversing district court's entry of summary judgment in favor of mortgage servicer on breach of contact claim, where servicer refused plaintiff's tendered payments, and stating: "To swallow GMAC Mortgage's argument, we would have to accept, as a matter of law, that a lender is free to refuse a tendered payment and then to hold the borrower responsible for having failed to make the payment. . . .  We do not

accept that argument.").  Moreover, after Wells Fargo rejected Yacoubou's payments, Yacoubou was not required to continue to tender monthly payments, because Wells Fargo made clear that tendering further payments would be futile.  *See Cochran v. Griffith Energy Serv., Inc.*, 191 Md. App. 625, 993 A.2d 153, 166 (2010) ("'A tender is excused where the obligee has manifested to the obligor that tender, if made, will not be accepted, or that a tender would be at most merely a futile gesture.'") (citation omitted).

In any event, contrary to Yacoubou's apparent position, his tender would not have had the effect of erasing his underlying mortgage debt to Wells Fargo.  Rather, it would have had the effect of terminating the accrual of additional interest for the period in question.  *See Cochran*, 993 A.2d at 168 ("'The effect of a tender is to arrest the running of interest and to relieve the debtor of liability for costs . . . .'") (quoting *Forwood v. Magness*, 143 Md. 1, 6, 121 A. 855 (1923)); *see also* Sarah Howard Jenkins, 13 CORBIN ON CONTRACTS § 67.6, at 33 (Joseph M. Perillo, ed., rev. ed. 2003, Fall 2010 Supp.) ("The creditor's refusal of a proper tender of the money due prevents the debtor from being guilty of a breach of duty, although this refusal does not discharge the debtor's duty. . . .  [T]he creditor has no right to interest beyond the due date or to other damages.  Interest as damages for breach is not collectible because the debtor has not breached.") (footnotes omitted).  Thus, even assuming that the Modification is valid, and that Wells Fargo will accept plaintiff's payments, there is no legal basis to excuse Yacoubou from making the monthly principal and interest payments that he agreed to pay in the Modification.[19]

In addition to his dispute concerning the Modification, Yacoubou asserts several

---

[19] Wells Fargo has not made a demand in this suit that plaintiff satisfy those obligations.

miscellaneous alleged breaches by Wells Fargo.[20]   And, as noted, Wells Fargo argues that

Yacoubou's own breaches of contract preclude him from complaining of Wells Fargo's breach

with respect to the Modification.   The common thread connecting these competing allegations of

breach is that all of the alleged breaches predated the Modification.   Assuming, again, that the

Modification took effect, all of the alleged pre-Modification breaches were waived by the

execution of the Modification.   "A party waives a contractual right by intentionally relinquishing

the right or engaging in conduct that warrants the inference that the right has been relinquished."

*La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 213 (2008).

The Maryland Court of Appeals recently reviewed its jurisprudence as to waiver in

*Hovnanian Land Investment Group, LLC v. Annapolis Towne Centre at Parole, LLC*, ___ Md.

___, No. 71, Sept. Term 2010 (filed July 20, 2011).   In *Hovnanian*, the Court said: "Given the

highly factual nature of the waiver inquiry, it is an uncommon case in which the issue can be

resolved by summary judgment."   "Occasionally, however," the Court explained, "the waiver is

so obvious that a ruling can be made as a matter of law."   *Id.*, slip op. at 30-31.   One such

situation is where the parties have entered into a new contractual relationship, replacing the

agreement that allegedly was breached, with knowledge of the prior breaches.   *See Edelstein v.*

*Nationwide Mut. Ins. Co.*, 252 Md. 455, 461 (1969) ("Edelstein could not recover for alleged

---

[20]   For instance, Yacoubou claims that Wells Fargo violated its contractual duties by
unilaterally increasing his monthly payment in June 2008, *id.* ¶ 16; by sending its notice of
foreclosure in September 2008 to the Property, rather than to his "designated address," *id.* ¶ 17;
and by claiming in the notice of foreclosure that the "last payment date" was July 1, 2008,
although plaintiff's last payment had been made in September 2008.  *Id.* ¶ 18.

In the sections of his motion papers devoted to Count I, Yacoubou also contends that
Wells Fargo "violated various provisions of RESPA by refusing to adequately respond to
'qualified written request[s]'" that Yacoubou sent to Wells Fargo in the course of the parties'
dispute.   I will address the alleged RESPA violations in my discussion of plaintiff's allegations
of defamation, *infra*.

breaches of prior contracts between the parties occurring subsequent to [date of new contract], inasmuch as [the new contract] specifically provides that the agreement supersedes and takes the place of any prior agreement . . . ."); *see also Balt. Acad. of Visitation v. Schapiro*, 169 Md. 332, 181 A. 731, 734-35 (1935) (concluding that a similar mortgage modification constituted a novation); *cf. Cutler v. Sugarman Org.*, 88 Md. App. 567, 580-81, 596 A.2d 105, 112 (1991) ("Once there has been a novation, with a substantial concession by the party accused of committing a fraud, and the party alleging the fraud knew of the fraud and knew he or she had a cause of action for the fraud, the novation represents an informal settlement between the parties for any fraud and implies, as a matter of law, a waiver of any claim to fraud.") (citing *Holder v. Maaco*, 644 F.2d 310, 312-13 (4th Cir. 1981) (applying Maryland law)).

Assuming the Modification took binding effect, the parties' agreement to the Modification would operate as a waiver of the parties' alleged prior breaches. Thus, to the extent that Yacoubou seeks to recover for alleged breaches by Wells Fargo prior to the date of the Modification, his claims would be barred. Similarly, it is undisputed that Wells Fargo was aware that Yacoubou was not living at the Property when it offered Yacoubou the Modification. Therefore, execution of the Modification would constitute a waiver of Wells Fargo's claim that Yacoubou breached his contractual obligations by failing to use the Property as his primary residence.[21]

---

[21] In a footnote, Wells Fargo also points out that Yacoubou admitted in his deposition that he was not a chemical engineer, despite having described himself as a chemical engineer in his loan application. Although Yacoubou's apparent falsification of his loan application is a serious matter, I decline to award summary judgment in Wells Fargo's favor on this ground, because the record does not make clear when Wells Fargo learned that Yacoubou had falsified his employment information. If Wells Fargo was aware of the falsification before it entered into the Modification, a fact finder could determine that the Modification waived this prior breach. In

Accordingly, neither party is entitled to summary judgment with respect to the breach of contract claim in Count I.

Wells Fargo contends that, in any event, it is entitled to partial summary judgment as to damages.  It concedes that, if it breached the contract, it is at least liable for nominal damages.  Wells Fargo MSJ at 9 n.2.  *See Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001) ("[I]t is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages.").  But, Wells Fargo maintains that Yacoubou has the burden to prove damages and cannot demonstrate any actual damages.  "[A]ctual damages require proof of actual loss, the amount of which is determined by the fact-finder."  *AGV Sport Group, Inc. v. Proteus IP Solutions, Inc.*, 417 Md. 386, 398-99, 10 A.3d 745, 752 (2010).

The basis for Wells Fargo's contention is that, in discovery, Yacoubou did not provide any documentary evidence of his damages.  At Yacoubou's deposition, Yacoubou testified as to incessant collections calls from Wells Fargo, which he asserted caused him sleeplessness and anxiety.  He testified that "fear . . . hits me, the phone becomes like a needle somebody is pointing into my heart.  The phone rings.  It's like, oh no, it's them again.  You pick it up.  Nobody is there.  Just a message."  Yacoubou Dep. at 120.  However, Yacoubou was unable to quantify his damages or provide documentation to establish them.

It may be that Yacoubou will ultimately be unable to prove actual damages.  However, as I discuss in Part D, *infra*, I will allow a period of limited additional discovery as to plaintiff's defamation and RESPA claims.  During that discovery period, plaintiff may provide defendant with any additional evidence he intends to use to prove damages (unless he has already done so).

addition, Wells Fargo's assertion that the falsification was a material breach is undercut by the fact that Wells Fargo devoted one footnote to this matter in its brief.

At the conclusion of this additional period for discovery, Wells Fargo may renew its motion for summary judgment with respect to damages.

## D.  "Libel and Slander" (Count III)

Plaintiff argues that Wells Fargo's "reporting of false information about the Plaintiff to credit bureau[s] and other institutions gave him a bad reputation that lead [sic] to the closing of his American [E]xpress gold card, Citibank, and Bank of America accounts." Yacoubou MSJ at 2. In support of his claims, Yacoubou has submitted letters from three of his creditors (American Express, Citibank, and Bank of America), reflecting the closing of his accounts on the basis of negative reports about Yacoubou from credit reporting agencies.[22] In response, Wells Fargo maintains that Yacoubou has not presented sufficient evidence to satisfy the elements of a claim for defamation.[23]

Under Maryland law, "'[a] defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'" *Norman v. Borison*, 418 Md. 630, 645 n.10 (2011) (citation omitted).  The tort of defamation consists of four elements: "'(1) that

---

[22]  The letter from Citibank, dated October 12, 2008, referenced "a delinquent credit obligation . . . with another creditor." Ex. 8, at 1, to Yacoubou Opp.  Similarly, the letter from American Express, dated April 9, 2009, stated: "Your credit report indicates that you have a serious delinquency on one or more of your accounts."  *Id.* at 2.  Wells Fargo contends that plaintiff's Bank of America account was closed due to inactivity.  But, as plaintiff points out, closer inspection of Bank of America's letter suggests otherwise.  Bank of America's letter, dated December 19, 2008, informed Yacoubou that it was closing his account, which had "been inactive for greater than 12 months."  *Id.* at 3.  However, the letter stated: "As part of the decision to close the account, we obtained consumer report information, such as information about your accounts with other creditors, from a consumer reporting agency."  *Id.* at 4.

[23]  The tort of defamation includes both libel (written defamation) and slander (oral defamation).  *See Gen'l Motors Corp. v. Parker*, 27 Md. App. 95, 113 (1975), *aff'd in part, rev'd in part on other grounds sub nom. Gen'l Motors Corp. v. Piskor*, 277 Md. 165 (1976).  For purposes of this case, the distinction is not material.

the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Id.* (citations omitted).

In support of his defamation claim, plaintiff cites RESPA (the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.*) and cases interpreting it.[24]   RESPA imposes liability on mortgage servicers (such as Wells Fargo) for certain communications to third parties.  Unlike the tort of defamation, however, RESPA liability does not hinge on the truth or falsity of the communication.  Rather, RESPA imposes limits on *when* a mortgage servicer may communicate with third parties.

RESPA requires a mortgage servicer to respond to a borrower's "qualified written request."  A "qualified written request" consists of written correspondence from a borrower that identifies the borrower and account at issue, and "includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B).  Within sixty days after receipt of a qualified written request, a servicer must investigate the matters addressed by the request, and must respond to the borrower in writing, either correcting the error identified by the borrower, explaining "the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer," or providing the "information requested by

---

[24] Wells Fargo notes that plaintiff's complaint did not specifically allege a violation of RESPA.  However, the factual allegations of plaintiff's complaint (which allege liability on the basis of Wells Fargo's servicing of plaintiff's mortgage and its communications to third parties about plaintiff) are sufficient to put Wells Fargo on notice that its duties under RESPA could be at issue in the suit.  Moreover, Wells Fargo does not contend that it is prejudiced by consideration of plaintiff's RESPA claims.  Given the liberal construction that must be afforded to the complaints of *pro se* litigants, I will construe Count III of plaintiff's complaint as alleging RESPA violations, in addition to defamation.

the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer." *Id.* § 2605(e)(2).  Of import here, during the sixty-day period, "beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency . . . ." *Id.* § 2605(e)(3).  A servicer's violation of this provision entitles a borrower to recover actual damages, as well as statutory damages of up to $1,000 in cases showing a "pattern or practice of noncompliance." *Id.* § 2605(f).

Wells Fargo argues that Yacoubou has not presented "evidence of any specific communication upon which his claim is based, much less evidence that Wells Fargo communicated *false* information concerning his credit to any third party." Wells Fargo MSJ at 11 (emphasis in original).[25]  According to Wells Fargo, it is "undisputed" that Yacoubou "got behind (was late and ultimately in default) in his mortgage payments in mid 2008 and he remains in default to this day." *Id.*  Wells Fargo notes that Yacoubou "specifically testified in his deposition that he does not know what credit information is being reported by Wells Fargo." *Id.* at 12.  Without such knowledge, argues Wells Fargo, Yacoubou "cannot possibly meet his burden of proof." *Id.*  Wells Fargo posits: "Whatever credit and financial problems the Plaintiff is (or is not) experiencing could be due to a variety of factors having nothing to do with Wells

---

[25] Wells Fargo also suggests that plaintiff's claims "may possibly be pre-empted" by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681n *et seq.*  In support of this proposition, Wells Fargo cites a single case, *Sloane v. Equifax Information Services, LLC*, 510 F.3d 495 (4th Cir. 2007), in which the Fourth Circuit observed, in a footnote, that the FCRA preempts defamation actions only "in certain specified contexts," and proceeded to cite several cases in which courts expressly upheld defamation liability in spite of the FCRA. *Id.* at 506 n.4.  I decline to undertake a preemption analysis on the basis of mere speculation, without any analysis presented by Wells Fargo.

Fargo." *Id.* at 13.   Notably, however, Wells Fargo does not actually deny that it sent communications about Yacoubou to third parties.

Clearly, without evidence of the exact substance and timing of Wells Fargo's communications to credit reporting agencies or other creditors, plaintiff cannot demonstrate that he is entitled to judgment as a matter of law.   Accordingly, I will deny Yacoubou's motion for summary judgment as to Count III.   However, I will also deny Wells Fargo's motion for summary judgment as to this claim, for the reasons that follow.

First, although plaintiff's evidence is certainly thin, he has adduced circumstantial evidence that, taken in the light most favorable to him, could persuade a trier of fact, based on the preponderance of the evidence, that Wells Fargo communicated false statements about him to third parties or sent communications to consumer reporting agencies in violation of RESPA. Notably, Yacoubou testified at his deposition that he was always current on all of his credit card accounts.   Yacoubou Dep. at 137-38.   If Yacoubou was current on all of his other financial obligations, except his obligation to Wells Fargo, the timing of the account closures, which were concurrent with Yacoubou's disputes with Wells Fargo, could lead a fact finder to conclude, by process of elimination, that the account closures were based on Wells Fargo's reporting of Yacoubou's alleged delinquency to consumer reporting agencies.

Notably, two of the account closures (reflected in the Bank of America letter, dated December 19, 2008, and the American Express letter, dated April 9, 2009) took place after Yacoubou signed the Modification in November 2008.   If the Modification formed a binding contract, then Yacoubou was not in default.   Therefore, if Wells Fargo informed a consumer

reporting agency that Yacoubou was in default after the Modification became binding, such a report would have been false.[26]

Turning to RESPA, the record discloses that plaintiff sent at least two "qualified written requests" to Wells Fargo, in the form of letters dated October 23, 2008 (ECF 53-2) and January 31, 2009 (ECF 53-5).  Both of them clearly identified Yacoubou, provided his account number, and included "a statement of the reasons for the belief of the borrower . . . that the account is in error."  12 U.S.C. § 2605(e)(1)(B).  Accordingly, under RESPA, Wells Fargo was prohibited from reporting information about Yacoubou's alleged delinquency (whether true or false) to any consumer reporting agency for a sixty-day period after receipt of each letter (*i.e.*, from on or about October 23, 2008, until December 22, 2008, and from on or about January 31, 2009, until April 1, 2009).  Given that one of the letters from plaintiff's creditors closing his account was sent during one of those sixty-day periods (the letter from Bank of America, dated December 19, 2008), a finder of fact could infer that it was based on a communication prohibited by RESPA.

To be sure, Wells Fargo suggests that plaintiff has not established that Wells Fargo sent any communications to third parties.  But, Wells Fargo has not presented any evidence of what communications, if any, it sent to the creditors or others regarding Yacoubou.  Nor has it made any claim or presented any evidence showing it did *not* send any communications to third parties regarding Yacoubou.  Given that such evidence is plainly in Wells Fargo's possession or control,

---

[26] The mere falsity of the statement, without more, would not establish Wells Fargo's liability for defamation.  Even if Wells Fargo communicated a false statement about Yacoubou, this would satisfy only one of the four elements of a defamation claim.  *See Norman*, *supra*, 418 Md. at 645 n.10 (listing elements).  However, at this juncture, Wells Fargo has presented no argument concerning the other three elements of the tort.

I decline to indulge Wells Fargo's speculation as to other possible bases for Yacoubou's poor credit reports.

I acknowledge that Yacoubou could have obtained, through discovery, evidence of any communications about him that Wells Fargo sent to third parties. However, Yacoubou's motion papers reveal that he was laboring under a misconception regarding the scope of discovery, perhaps occasioned by a prior order of the court.

As noted, before a scheduling order was issued in this case, Yacoubou asked the court to issue a subpoena to Wells Fargo (ECF 13). Wells Fargo opposed the motion on several grounds, one of which was that such a subpoena was premature. *See* ECF 17. As Wells Fargo correctly noted, this court's Local Rules provide that discovery may not commence until a scheduling order has been issued. *See* Local Rule 104.4. The court denied Yacoubou's motion, but did not explain the reason for the denial. The same day, the court issued a scheduling order, which permitted discovery to commence.

Thereafter, plaintiff made no requests of Wells Fargo for document production or other discovery. Based on assertions in his motion papers, however, plaintiff appears to have believed (mistakenly) that the court prohibited him from posing discovery requests to Wells Fargo. Yacoubou states that "it is the Plaintiff's belief that he is not getting equitable treatment from [the] court," because the "Court denies the Plaintiff the right to ask questions. The discovery has been only in one direction. The Plaintiff is the only one answering questions while the Defendant Wells Fargo is exempt from answering." Yacoubou MSJ at 5. Further, he asserts that "the court is helping the Defendant to obstruct justice by denying the Plaintiff['s] request" for subpoenas. Yacoubou Opp. at 6.

Yacoubou's invective against the court was misplaced.  The court did not prohibit Yacoubou from engaging in discovery.  However, the court's orders may not have been altogether clear to plaintiff, who is self represented.

In light of plaintiff's *pro se* status, and because Wells Fargo obviously possesses knowledge or evidence of the timing and content of any communications regarding Yacoubou that Wells Fargo may have sent to third parties, I will permit a brief period of further discovery, pertinent to this issue.  Thereafter, if warranted, the parties may file renewed motions for summary judgment as to plaintiff's defamation and RESPA allegations.

### E.  Negligence (Count IV)

Yacoubou's argument with respect to his negligence claim is essentially cumulative of his arguments regarding breach of contract.  With regard to the Modification, he claims that Wells Fargo "failed to send the new contract to plaintiff" and "failed to give the monthly payment amount to the plaintiff."  Yacoubou MSJ at 3.  He contends that, as a result, he suffered "severe, painful and permanent injuries to his heart and back," as well as a "loss of income and enjoyment of life."  *Id.*

To establish negligence, a plaintiff must prove four elements: (1) a duty owed to the plaintiff (or to the class of which the plaintiff is a part); (2) a breach of the duty; (3) a "legally cognizable causal relationship between the breach of duty and the harm suffered"; and (4) damages.  *Jacques v. First Nat. Bank*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986).  "Absent a duty of care there can be no liability in negligence."  *Id.* at 532, 515 A.2d at 758; *see Blondell v. Littlepage*, 413 Md. 96, 119-20, 991 A.2d 80, 94 (2010); *Gourdine v. Crews*, 405 Md. 722, 745, 955 A.2d 769, 783 (2008).  Moreover, "'[t]he mere negligent breach of a contract, absent a duty

or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'" *Jacques*, 307 Md. at 534, 515 A.2d at 759 (quoting *Heckrotte v. Riddle*, 224 Md. 591, 595, 168 A.2d 879 (1961)); *see Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999).

Here, plaintiff has not identified any tort duty breached by Wells Fargo, "'independent of that arising out of the contract itself.'" *Jacques*, 307 Md. at 534, 515 A.2d at 759.  Accordingly, I will grant summary judgment to Wells Fargo as to the negligence claim.

### F.  "Strict Liability" or FDCPA Violation (Count V)

Despite the prior ruling of the court that Count V of plaintiff's complaint ("strict liability") could be construed liberally to state a cause of action under the FDCPA, Wells Fargo argues that it is not subject to the FDCPA in this case, because it is not a "debt collector" with respect to Yacoubou's mortgage.  I agree with Wells Fargo.

The FDCPA imposes obligations on "debt collectors," who are generally defined, in relevant part, as entities that "collect[] or attempt[] to collect, directly or indirectly, debts owed or due or asserted to be owed or due to another."  15 U.S.C. § 1692a(6).  However, the definition of "debt collector" contains an exemption for an entity, such as a mortgage servicer, that collects debts that were "not in default at the time [they were] obtained" by the entity.  *Id.* § 1692a(6)(F)(iii).  Thus, it "is well-settled . . . that . . . *mortgage servicing companies* are not debt collectors and are statutorily exempt from liability under the FDCPA," to the extent that they take action to collect debts that were not in default at the time they acquired the debts. *Scott v. Wells Fargo Home Mortgage, Inc.*, 326 F. Supp. 2d 709, 718 (E.D. Va.) (emphasis in original), *aff'd mem.*, 67 F. App'x 238 (4th Cir. 2003); *accord Flores v. Deutsche Bank Nat'l*

*Trust Co.*, Civ. No. DKC-10-217, 2010 WL 2719849, at *6 (D. Md. July 7, 2010); *Sparrow v. SLM Corp.*, Civ. No. RWT-08-12, 2009 WL 77462, at *2 (D. Md. Jan. 7, 2009); *see also De Dios v. Int'l Realty & Investments*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) (citing legislative history of the FDCPA indicating that the exception in § 1692(a)(6)(F)(iii) was intended to provide that "'mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing,'" are not debt collectors).

There is no dispute that plaintiff's mortgage was not in default when Wells Fargo became plaintiff's mortgage servicer.  Accordingly, for purposes of the FDCPA, Wells Fargo is not a "debt collector" with respect to plaintiff's mortgage debt, and is entitled to summary judgment as to Count V of plaintiff's complaint.

## G.  Motion for "Speedy Trial"

Plaintiff has filed a "Motion to Request a Speedy Jury Trial" (ECF 44), although its content is substantially the same as his motion for summary judgment.[27]  As discussed above, Wells Fargo is entitled to judgment as a matter of law as to certain counts of Yacoubou's complaint, and others merit further factual development.  Accordingly, this case is not yet ready for trial, and I will deny ECF 44.  If Yacoubou's claims remain viable after further discovery, the Court will schedule the case for trial in due course.

---

[27] Notably, the right to a "speedy trial" is ordinarily associated with criminal proceedings. *See* U.S. CONST., Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."); 18 U.S.C. § 3161 (the Speedy Trial Act, which generally requires that a criminal defendant be tried within 70 days of being indicted or appearing before a judge).  Although prompt resolution of all cases is desirable, there is no right to a "speedy trial," *per se*, in civil actions.

**Conclusion**

For the foregoing reasons, I will deny Yacoubou's "Motion to Request a Speedy Jury Trial" (ECF 44), and his motion for summary judgment (ECF 46).  I will grant Wells Fargo's motion for summary judgment (ECF 50), in part, and deny it in part.  Specifically, I will grant summary judgment to Wells Fargo with respect to Counts IV and V of plaintiff's complaint, but I will deny summary judgment as to Counts I and III.  Further, I will permit a brief period of further discovery limited to two matters: (1) plaintiff's damages, and (2) communications regarding Yacoubou sent by Wells Fargo to third parties.  An Order implementing these rulings follows.

Dated: August 26, 2011                                  _____/s/_____
                                                         Ellen Lipton Hollander
                                                         United States District Judge