IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ABDOU-MALIK YACOUBOU ADAM,

*Plaintiff*,

v.                                            Civil Action No. ELH-09-2387

WELLS FARGO BANK, N.A.,

*Defendant*.

## MEMORANDUM OPINION

Abdou-Malik Yacoubou Adam ("Yacoubou"),[1] the self-represented plaintiff, filed suit against Wells Fargo Bank, N.A. ("Wells Fargo"), defendant.[2]  In his Complaint (ECF 2), plaintiff set forth five claims arising from Wells Fargo's servicing of a mortgage on real property owned by Mr. Yacoubou, located at 3805 Mayberry Avenue in Baltimore, Maryland (the "Property"), and sought $2 million in "compensatory damages."  On July 28, 2010, Judge J. Frederick Motz dismissed Count II of the complaint, which alleged discrimination on the basis of "race, national origin, and religion."  *See* Memorandum and Order (ECF 32 & 33).[3]

---

[1] There has been some confusion in this litigation regarding which of plaintiff's names is the proper surname by which to address him.  At a hearing held on September 27, 2012, plaintiff clarified that he prefers to be addressed as Mr. Yacoubou.

[2] Plaintiff filed suit in the Circuit Court for Baltimore City.  Wells Fargo removed the case to this Court, based on diversity of citizenship.  *See* 28 U.S.C. §§ 1332(a) (original jurisdiction based on diversity); 1441(a)-(b) (removal jurisdiction).  Plaintiff is a resident of Maryland, while Wells Fargo is a national banking association that, for jurisdictional purposes, is a citizen of South Dakota, the state where its main office is located.  *See* 28 U.S.C. § 1348 (national banking associations are "deemed citizens of the States in which they are respectively located"); *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 307 (2006) (holding "that a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located").

[3] The case was reassigned to me on January 13, 2011.

On August 26, 2011, I issued a Memorandum Opinion, ruling on cross-motions for summary judgment. In particular, I granted judgment in favor of Wells Fargo as to Count IV, alleging negligence, and Count V, which alleged "strict liability," but which the Court construed liberally as a claim under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*[4] *See* Memorandum Opinion and Order (ECF 60 & 61). Two counts survived the cross-motions for summary judgment: Count I, alleging breach of contract, and Count III, which asserted the tort of defamation, and which could also liberally be construed as alleging violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.* As to those counts, I denied the motions for summary judgment. I also granted the parties a limited period of additional discovery, after which the parties would be permitted to file renewed motions for summary judgment.

Mr. Yacoubou noted an appeal of my summary judgment ruling to the United States Court of Appeals for the Fourth Circuit, although my summary judgment ruling was not a final judgment that disposed of all claims in the suit. The Fourth Circuit dismissed the appeal in April 2012, as premature. *See Yacoubou Adam v. Wells Fargo Bank*, 471 F. App'x 121, 122 (4th Cir. 2012) ("The orders Adam seeks to appeal are neither final orders nor appealable interlocutory or collateral orders. Accordingly, we . . . dismiss the appeal for lack of jurisdiction.").

Thereafter, the parties filed renewed cross-motions for summary judgment, which were fully briefed.[5] I heard oral argument on the motions on September 27, 2012. For the reasons

---

[4] Because plaintiff is proceeding without an attorney, he is entitled to liberal construction of his claims. *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[5] I have considered Wells Fargo's renewed motion for summary judgment (ECF 87) (collectively with its supporting memorandum, ECF 87-1, "Second Wells Fargo MSJ"); Yacoubou's "Response to Renewed Motion for Final Summary Judgment of Defendant Wells

that follow, I will grant in part and deny in part the parties' motions for summary judgment.  In particular, judgment will be entered in favor of Mr. Yacoubou for nominal damages of $250 as to Count I (breach of contract).  However, judgment will be entered in favor of Wells Fargo as to liability for compensatory damages as to Count I.  And, judgment will be granted to Wells Fargo as to Count III.

**Background**

The facts underlying the parties' claims were fully discussed in my prior Memorandum Opinion (ECF 60).  Although the parties have adduced some additional evidence in connection with the renewed motions, none of the additional evidence has called into dispute any of the factual background set forth in the earlier opinion.  Accordingly, I expressly incorporate my earlier Memorandum Opinion into this ruling, and assume the reader's familiarity with it.  I reiterate only the facts that are most salient to the issues that remain in dispute.

Mr. Yacoubou purchased the Property in January 2005, and refinanced the Property in October 2007. Under the refinancing agreement, Mr. Yacoubou's total monthly mortgage payment was $1,652.50 (inclusive of principal, interest on the loan, and amounts to be escrowed for insurance and real estate taxes).  Shortly after the refinancing, the mortgage lender for the refinancing agreement transferred the servicing of the mortgage to Wells Fargo.  *See* ECF 49-3.

Beginning in June or July 2008, financial difficulties on Mr. Yacoubou's part and a payment dispute that arose between Mr. Yacoubou and Wells Fargo caused the mortgage loan to become delinquent.  The nature of the dispute is not relevant to the issues now at hand.  As a

---

Fargo and Request for Summary Judgment" ("Second Yacoubou MSJ") (ECF 92); Wells Fargo's reply in support of its motion and response in opposition to Yacoubou's motion ("Second Wells Fargo Reply") (ECF 93); and Yacoubou's reply ("Second Yacoubou Reply") (ECF 95).

result of the dispute, Wells Fargo proposed a modification of Mr. Yacoubou's loan.[6]

On November 3, 2008, Wells Fargo sent Mr. Yacoubou a letter to "confirm [Wells Fargo's] formal approval of a loan modification/restructure of [Yacoubou's] mortgage loan," along with a "Loan Modification Transmittal Form" and a proposed "Loan Modification Agreement (the "Modification"). *See* ECF 50-13. The letter asked Mr. Yacoubou to "sign the enclosed loan modification agreement and return it." The letter also stated: "This proposal is valid for five (5) days from the date of this letter." The Modification contained two blank signature lines, one for Yacoubou and one for "Wells Fargo Bank, N A, Officer." *Id*. Mr. Yacoubou signed the Modification on November 10, 2008, and returned it to Wells Fargo.[7] *See id*. However, the record does not contain a copy reflecting that it was signed by a representative of Wells Fargo. Among other changes to the terms of Mr. Yacoubou's mortgage loan, the Modification lowered Mr. Yacoubou's total monthly payment from $1,652.50 to $1,357.74, representing a monthly principal and interest payment of $1,024.53, plus a monthly escrow payment of $333.21 for taxes and insurance.

Wells Fargo asserts that it sent another proposed modification agreement to Mr. Yacoubou on or about November 28, 2008. According to Wells Fargo, the second modification was sent to plaintiff after Wells Fargo "determined that there was a minor error in the monthly payment calculation" set forth in the Modification. ECF 50-1 at 5. The only difference between

---

[6] The nature of the dispute is summarized in more detail in my earlier Memorandum Opinion. *See* ECF 60 at 5-10. The parties disagree as to some of the facts involved, but the disputes are not relevant because the modification waived any prior breaches of the loan agreement. *See* ECF 60 at 27-29.

[7] In a subsequent letter to Wells Fargo, Mr. Yacoubou asserted that he did not receive the Modification until November 10, 2008, but that he signed it "the same night [*i.e.*, November 10] and sent [it] back the next day." ECF 53-5 at 1.

the first offer and the second offer was that Mr. Yacoubou's monthly payment was seven cents more ($1,357.81 rather than $1,357.74) under the second offer.[8]   At his deposition in December 2010, Mr. Yacoubou claimed that he never received the second modification offer.

At the time I considered the original cross-motions for summary judgment, the alleged second modification offer was not contained in the record.   After I issued my Memorandum Opinion in August 2011, Wells Fargo was able to locate an electronic copy of the second modification offer, and submitted it as an exhibit to a status report filed on November 1, 2011. *See* ECF 72-1.

In any event, on January 6, 2009, having not received further communication from Wells Fargo or a confirmation regarding the original loan Modification, Mr. Yacoubou sent Wells Fargo a check for $1,357.74, the monthly payment specified in the Modification.   On January 15, 2009, Wells Fargo sent Yacoubou a letter advising him that his "request for Loan Modification has been denied" because the parties were "unable to come to a mutual agreement regarding [Mr. Yacoubou's] request for a workout."   On January 19, 2009, Wells Fargo returned Yacoubou's $1,357.74 check to him, stating that "the funds do not represent the total amount due to reinstate the account."   On or about February 9, 2009, Mr. Yacoubou sent Wells Fargo a check for $2,715.48 (*i.e.*, two monthly payments of $1,357.74).   Again, on February 13, 2009, Wells Fargo returned the check to Yacoubou, stating that it was insufficient "to reinstate the account."   The February 2009 check was Mr. Yacoubou's last attempt to send payment to Wells Fargo.

---

[8] The discrepancy apparently resulted from a $15 difference in the amount of principal, attributed to the fact that the second offer did not reduce the modified unpaid principal balance by the "recoverable expense credit."

On April 8, 2009, Wells Fargo, through substitute trustees, initiated a foreclosure action against Mr. Yacoubou in the Circuit Court for Baltimore City, captioned *Buonassissi v. Yacoubou Adam*, Civ. No. 24-O-09-001553 ("*Buonassissi I*"). A foreclosure sale of the Property was scheduled for July 28, 2009. However, on June 15, 2009, Mr. Yacoubou filed a motion to enjoin the foreclosure sale. According to Wells Fargo, Mr. Yacoubou also "threatened litigation." On June 18, 2009, before the circuit court ruled on Mr. Yacoubou's motion, Wells Fargo's substitute trustees voluntarily dismissed *Buonassissi I*.

On July 28, 2009, Mr. Yacoubou filed his complaint in the case *sub judice*. The next day, Ashley Kenney, an employee of the law firm representing the substitute trustees in *Buonassissi I*, wrote to Yacoubou, offering on behalf of Wells Fargo to "honor" the original Modification, to which plaintiff had initially agreed. *See* ECF 50-17. Ms. Kenney wrote:

> This letter is to inform you that Wells Fargo Bank, N.A. will honor the 11/3/2008 loan modification agreement conditioned on you bringing the arrears current no later than September 1, 2009. Please contact us as soon as possible to arrange for payment of the arrearage. You will need to pay $12,144.66 to pay your arrearages in full and bring your loan current by September 1, 2009. (This amount was calculated based on nine (9) payments of $1,357.74 that will be due as of September 1, 2009 equaling $12,219.66. You were given a credit of $75.00 towards this arrearage bringing your total balance to $12,144.66).

Mr. Yacoubou rejected Wells Fargo's offer, and this litigation continued. Meanwhile, on March 4, 2010, the substitute trustees initiated another foreclosure proceeding against Mr. Yacoubou in the Circuit Court for Baltimore City, captioned *Buonassissi v. Yacoubou Adam*, Civ. No. 24-O-10-000968 ("*Buonassissi II*"). However, according to the public, unofficial docket for that case, available via the Maryland Judiciary's "Case Search" website (http://casesearch.state.md.us/), the substitute trustees voluntarily dismissed *Buonassissi II*, without prejudice, in October 2011. No foreclosure sale of the Property has occurred.

As noted, at least until the Modification was executed, plaintiff was in default as to his mortgage payments. Moreover, it is undisputed that plaintiff has not made any mortgage payments since his unsuccessful attempts in January and February 2009. The last payment that was actually applied to plaintiff's mortgage was made in September 2008 (this payment was applied to the payments that had been due in June and July 2008). *See* ECF 60 at 7-9.

Additional facts are included in the Discussion.

### Discussion

I incorporate by reference the discussion of the summary judgment standard of review and the governing substantive law in my earlier Memorandum Opinion. As I previously held, the state law claims in this diversity action are governed by the substantive law of Maryland.

### A.  Prior Summary Judgment Ruling

As noted, I previously denied summary judgment to both parties as to Mr. Yacoubou's breach of contract claim and his defamation/RESPA claim. As to the contract claim, I ruled that it was ambiguous whether the Modification became a binding contract upon Mr. Yacoubou signing it, or whether it required the additional signature of an officer of Wells Fargo, because of the otherwise unexplained blank signature line for an officer of Wells Fargo. I further recapitulate the basis for my ruling as to ambiguity, *infra*.

But, assuming the Modification became a binding contract upon the parties after it was executed by Mr. Yacoubou, I ruled that Wells Fargo breached the contract by refusing Mr. Yacoubou's tender of monthly payments in January and February 2009. *See Farmer v. Jamieson*, 31 Md. App. 37, 44-45, 354 A.2d 225, 230 (1976) ("The hindrance by one contracting party which impedes or prevents performance by the other constitutes a breach.") (citing *Funger*

*v. Mayor of Somerset*, 249 Md. 311, 330, 239 A.2d 748 (1968)); *accord Dexter v. Dexter*, 105 Md. App. 678, 684-85, 661 A.2d 171, 174, *cert. denied*, 341 Md. 27, 668 A.2d 36 (1995); *see also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 690 (7th Cir. 2011).

Moreover, I ruled that, after Wells Fargo rejected Mr. Yacoubou's payments, Mr. Yacoubou was not required to continue to tender monthly payments, because Wells Fargo made clear that tendering further payments would be futile. *See Cochran v. Griffith Energy Serv., Inc.*, 191 Md. App. 625, 648, 993 A.2d 153, 166 (2010) ("'A tender is excused where the obligee has manifested to the obligor that tender, if made, will not be accepted, or that a tender would be at most merely a futile gesture.'") (citation omitted). Nevertheless, I also concluded that, in contrast to Mr. Yacoubou's apparent position, the refusal of his tender would not have had the effect of erasing his underlying mortgage debt to Wells Fargo. Rather, it would have had the effect of terminating the accrual of additional interest for the period in question. *See id.* at 651, 993 A.2d at 168; *Forwood v. Magness*, 143 Md. 1, 6, 121 A. 855, 856 (1923); *see also* Sarah Howard Jenkins, 13 CORBIN ON CONTRACTS § 67.6, at 33 (Joseph M. Perillo, ed., rev. ed. 2003, Fall 2010 Supp.).

Wells Fargo argued that, even if it was not entitled to summary judgment as to breach of contract, it was entitled to partial summary judgment as to damages. As Wells Fargo notes, the plaintiff has the burden to prove his damages, and it claims that Yacoubou cannot demonstrate any actual damages. However, Wells Fargo expressly conceded that, "[i]f Plaintiff had a viable breach of contract claim, which [Wells Fargo maintained] he does not, he could recover nominal damages for the breach." ECF 50-1 at 9 n.2. Because I decided, for reasons recounted, *infra*, to

permit a period of additional discovery as to plaintiff's defamation and RESPA claim, I declined to rule on whether plaintiff had established actual damages until after further discovery.

Mr. Yacoubou's defamation and RESPA claim are both based on alleged negative reports regarding Mr. Yacoubou's mortgage repayment status and creditworthiness, which plaintiff claimed Wells Fargo had sent to credit reporting agencies or creditors of Mr. Yacoubou.  Under Maryland law, a defamation claim consists of four elements: "'(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Norman v. Borison*, 418 Md. 630, 645 n.10, 17 A.3d 697, 705 n.10 (2011) (citation omitted). "'A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'"   *Id.*  (citation omitted).

Unlike the defamation tort, which depends in part on the truth or falsity of communications, RESPA governs the timing of communications.  It imposes limits on *when* a mortgage servicer may communicate with third parties.  Within sixty days after receipt of a "qualified written request" from a borrower,[9] a servicer must investigate the matters addressed by the request, and must respond to the borrower in writing, either correcting the error identified by the borrower, explaining "the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer," or providing the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be

---

[9] A "qualified written request" consists of written correspondence from a borrower that identifies the borrower and account at issue, and "includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B).

obtained by the servicer."  12 U.S.C. § 2605(e)(2).  Of import here, during the sixty-day period,

"beginning on the date of the servicer's receipt from any borrower of a qualified written request

relating to a dispute regarding the borrower's payments, a servicer may not provide information

regarding any overdue payment, owed by such borrower and relating to such period or qualified

written request, to any consumer reporting agency . . . ."  *Id.* § 2605(e)(3).  A servicer's violation

of this provision entitles a borrower to recover actual damages, as well as statutory damages of

up to $1,000 in cases showing a "pattern or practice of noncompliance."  *Id.* § 2605(f).

At the time of my earlier summary judgment ruling, Mr. Yacoubou had presented

evidence that his other creditors declined to extend further credit from him, but he had not

presented any direct evidence that Wells Fargo had communicated with his creditors or credit

reporting agencies.  Proof that such communications were made would be a necessary predicate

to liability for either defamation or violation of RESPA.

However, Wells Fargo had presented no evidence affirmatively indicating that it had <u>not</u>

made such communications, and one would expect that information as to what communications

Wells Fargo made was within its possession and control.  Moreover, it was apparent that Mr.

Yacoubou had conducted essentially no discovery, and the court was concerned that he had

failed to do so because of his misunderstanding of an earlier ruling by Judge Motz that may not

have been entirely clear to a self-represented litigant.[10]   Accordingly, I denied both parties'

---

[10] Before a scheduling order was issued, Mr. Yacoubou filed a "Request for order to issue
a Subpoena to Wells Fargo to release copies of two telephone call recordings form [sic]
December 18, 2008 and January 12, 2009 as evidence" (ECF 11).  By local rule in this court,
"discovery shall not commence and disclosures need not be made until a scheduling order is
entered."  Local Rule 104.4.  Accordingly, Judge Motz denied Mr. Yacoubou's "Request for
order to issue subpoena."  *See* ECF 33.  However, Judge Motz did not expressly refer to Local

motions for summary judgment and permitted a further period of discovery, after which the parties could renew their summary judgment motions.

## B.  Defamation/RESPA

Following a period of further discovery, Wells Fargo has renewed its motion for summary judgment as to defamation and RESPA.  Among other arguments, Wells Fargo asserts that it did not make any communications whatsoever regarding Mr. Yacoubou to any consumer reporting agency between October 8, 2008 and April 6, 2009, which includes the time period in which Mr. Yacoubou's other consumer credit accounts were closed, and includes the time period during which the Modification was transmitted to and signed by Mr. Yacoubou.  In support of its factual assertion, Wells Fargo has submitted an affidavit of Bryan Drummond, an Assistant Vice President and Loan Administration Manager for Wells Fargo, whose "job responsibilities include managing credit reporting and credit disputes for Wells Fargo with respect to home mortgages." Ex. F to Second Wells Fargo MSJ (ECF 87-7).  According to Mr. Drummond, during the applicable time period, "all reporting to credit agencies (consumer reporting agencies) was suppressed, meaning that no information was submitted by Wells Fargo to the credit agencies during this time period." *Id.* ¶ 5.  Mr. Yacoubou has not submitted any evidence to contradict Mr. Drummond's sworn assertion.[11]

---

Rule 104.4 in his ruling, and Mr. Yacoubou apparently believed that the court had ruled he was not entitled to conduct discovery at all.

[11] By Orders issued on May 8 and May 17, 2012 (ECF 83 & 86), I permitted Wells Fargo to obtain copies of Mr. Yacoubou's credit history reports from the three major credit reporting agencies, and directed that Mr. Yacoubou be provided with copies of the reports.  Neither party chose to submit the reports received from the credit reporting agencies, although Wells Fargo's counsel represented at the hearing on September 27, 2012, that the reports were consistent with Mr. Drummond's assertions.  In any event, because neither side has submitted the credit history reports, they are not available for consideration by the Court.

Accordingly, as the record now stands, there is no dispute of material fact with regard to either the defamation claim or the RESPA claim.  As a necessary predicate for plaintiff to prevail as to either allegation, he would need to prove that Wells Fargo sent a communication about him to a third party.  The unchallenged evidence in the record is that no such communications were sent at any relevant time.  Therefore, neither the defamation claim nor the RESPA claim is viable.

Moreover, as I discuss below in the context of the breach of contract claim, Mr. Yacoubou is unable to prove any actual damages.  That, too, is fatal to his defamation and RESPA claims.  It is a necessary element of the defamation tort "'that the plaintiff . . . suffered harm'" from a defamatory statement.  *Norman*, 418 Md. at 645 n.10, 17 A.3d at 705 n.10 (citation omitted).  Likewise, RESPA only permits recovery of the plaintiff's "actual damages," unless the plaintiff can demonstrate entitlement to a maximum of $1,000 in statutory damages for a "pattern or practice of noncompliance" with the statute.  12 U.S.C. § 2605(f).  There is no evidence as to a pattern or practice in this case on the part of defendant.

Accordingly, Wells Fargo is entitled to summary judgment with respect to Count III of plaintiff's complaint, which encompasses both the defamation and RESPA claims.[12]

## C.  Breach of Contract

As noted, in my previous Memorandum Opinion, I concluded that it was ambiguous whether the Modification required the signature of an officer of Wells Fargo in order to become binding or, instead, whether it became binding immediately upon Mr. Yacoubou's signing of the

---

[12] In light of my ruling, I need not address Wells Fargo's additional contention that a claim for defamation under state tort law in this context would be barred by the preemption provisions of the Fair Credit Reporting Act, 15 U.S.C. § 1681t(b)(1)(F).

Modification and transmission of it back to Wells Fargo.  The ambiguity arose from the otherwise unexplained blank signature line in the Modification for an officer of Wells Fargo. My analysis was as follows, ECF 60 at 23-26:

> [T]he letter attached to the Modification stated that it would "confirm our formal approval of a loan modification," and simply asked Yacoubou to "sign the enclosed loan modification agreement and return it."  Notably, the Modification contained blank signature lines for both Yacoubou and an officer of Wells Fargo.  In *Azimirad v. HSBC Mortgage Corp.*, Civ. No. DKC-10-2853, 2011 WL 1375970 (D. Md. Apr. 12, 2011), Chief Judge Deborah Chasanow recently discussed the uncertain effect of a blank signature line in a proposed contract, under Maryland law, in a case similar to the case at bar.  In that case, as in this one, a mortgage servicer, HSBC, sent a proposed loan modification to the mortgagor, Azimirad, who signed and returned it.  *See id.*, 2011 WL 1375970 at *1.  Thereafter, Azimirad sought to comply with the modification, but "he received a variety of answers from HSBC; one representative told him that HSBC planned to honor the Agreement, while another told him that the Agreement would need to be modified on different terms."  *Id.*   Azimirad sued HSBC, asserting breach of contract and other theories.  *Id.* at *2.  HSBC moved to dismiss on the ground that the loan modification agreement did "not bear a signature from HSBC," reasoning "that the absence of its signature means there is not a binding contract."  *Id.* at *3.  Rejecting HSBC's argument, Judge Chasanow reasoned, *id.* at *3-4:
>
> > Generally speaking, "a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract." *Porter v. Gen. Boiler Casing Co., Inc.*, 284 Md. 402, 410, 396 A.2d 1090 (1979); *see also Tow v. Miners Mem'l Hosp. Ass'n*, 305 F.2d 73, 75 (4th Cir. 1962) ("If a person has accepted a written agreement and has acted upon it he is bound by it, although he may not have set his hand to the document.").  "There is an exception to this rule, however, when the terms of the contract make the parties' signatures a condition precedent to the formation of the contract." *All State Home Mortg., Inc. v. Daniel*, 187 Md. App. 166, 181, 977 A.2d 438 (2009).[13]  Even when there is no signature requirement in the explicit terms of the contract, other evidence might be used to

---

[13]  In a footnote, Judge Chasanow explained that a "'condition precedent in a contract is a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises.'" *Azimirad*, 2011 WL 1375970, at *3 n.2 (quoting *All State*, 187 Md. App. at 182, 977 A.2d 438).

establish that such signatures were meant to be a condition precedent. *Id.* (citing *Pradhan v. Maisel*, 26 Md. App. 671, 677-78, 338 A.2d 905 (1975)).

HSBC argues that its signature was a condition precedent to the Loan Modification Agreement. Notably absent from the contract is any explicit statement that HSBC signature's was in fact such a condition. *Compare All State*, 187 Md. App. at 183, 977 A.2d 438 (finding signatures were condition precedent where contract stated that "[t]his agreement is effective and binding . . . when both parties sign it"); *see also Chiricella v. Erwin*, 270 Md. 178, 182, 310 A.2d 555 (1973) (describing words and phrases indicating express condition precedent). Nevertheless, HSBC maintains that the condition can be inferred [because] the Loan Modification Agreement contained a line for HSBC to sign as "Lender." Courts, however, have seemed generally unwilling to infer a condition precedent from a signature line alone. *See, e.g., Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559 Pa. 56, 66, 739 A.2d 133 (1999) ("[T]he mere presence of signature lines does not determine whether the parties intended to be bound only upon the execution of the document by all the signatories."); *Allen v. Ford Motor Credit Co.*, 8 F. Supp. 2d 702, 705 (N.D. Ohio 1998) (noting signature spaces are generally insufficient to establish condition precedent); *In re Marriage of Hasso*, 229 Cal. App. 3d 1174, 1181, 280 Cal. Rptr. 919 (1991) (finding attorney approval was not condition precedent to enforcement of settlement agreement, despite presence of signature line for attorney); *Ampex Credit Corp. v. Bateman*, 554 F.2d 750, 752 (5th Cir. 1977) (stating that blank signature lines do not conclusively establish condition precedent); *see also* 17A Am. Jur. 2d Contracts § 175 (2010 supp.) ("Signature spaces in a form contract do not in and of themselves require that signatures of the parties are a condition precedent to the agreement's enforceability.").

\* \* \*

At bottom, "[t]he determination of whether a provision in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties." *N.Y. Bronze Powder Co., Inc. v. Benjamin Acquisition Corp.*, 351 Md. 8, 14 n. 2, 716 A.2d 230 (1998). Where, as here, "ambiguity is found in a contract, it becomes a question of fact to decipher the intent of the parties in forming the instrument." *City of Bowie v. Mie* [*Properties, Inc.*, 398 Md. 657,] 684 n. 16 (2007).

Here, as in *Azimirad*, there is no language in the Modification indicating that Wells Fargo's signature was a condition precedent. The cover letter and the Modification do not contain language indicating that Wells Fargo's offer was conditional, or that any steps needed to be taken by Yacoubou to make the Modification effective, other than signing and returning it, as directed. As *Azimirad* indicates, however, the presence of the signature line for Wells Fargo renders the Modification ambiguous. Whether Wells Fargo's signature was a condition precedent is a question of fact that neither party has addressed in its briefing. A fact finder could conclude that, by signing the Modification and delivering it to Wells Fargo, Yacoubou accepted Wells Fargo's offer, creating a new contractual relationship between the parties. *See Cochran v. Norkunas*, 398 Md. 1, 24-25, 919 A.2d 700 (2007) ("'The well established rule is that in the absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is complete and the contract becomes binding upon both parties when the offeree deposits the acceptance in the post box.'") (citation omitted). Conversely, a fact finder could determine that the Modification was not binding until signed by an authorized representative of Wells Fargo.

Wells Fargo has renewed its motion for summary judgment as to damages. However, Wells Fargo has not advanced any evidence bearing on the ambiguity in the Modification.

Under Maryland law, "interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law . . . ." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003); *see also Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 523 (2003). When a contract is clear and unambiguous, "its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001) (citation omitted). Notably, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, contractual language is considered ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person. *Cochran*, *supra*, 398 Md. at 17, 919 A.2d at 710; *Auction & Estate*

*Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999).   To determine whether a contract is ambiguous, the court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract.  *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985).   *See Young v. Anne Arundel Cnty.*, 146 Md. App. 526, 587, 807 A.2d 651, 687 (2002), *cert. denied*, 372 Md. 432, 813 A.2d 259 (2002); *Univ. of Balt. v. Iz*, 123 Md. App. 135, 162, 716 A.2d 1107, 1121, *cert. denied*, 351 Md. 663, 719 A.2d 1262 (1998).   But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'"  *Cnty. Comm'rs for Carroll Cnty. v. Forty West Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209, *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Ordinarily, when a trial court finds that a contract is ambiguous, "the meaning of the contract is a question to be determined by the trier of fact."   *Iz*, 123 Md. App. at 162, 716 A.2d at 1121; *see First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 171, 838 A.2d 404, 447 (2003), *cert. denied*, 380 Md. 619, 846 A.2d 402 (2004).  Extrinsic evidence, such as evidence of the parties' prior agreements, negotiations, or articulations of the agreement's meaning, is admissible to clarify the meaning of an ambiguous contract.  *See Beale v. Am. Nat'l. Lawyers Ins. Reciprocal*, 379 Md. 643, 660, 843 A.2d 78, 89 (2004); *Sy-Lene*, *supra*, 376 Md. at 169, 829 A.2d at 547; *Bushey v. N. Assurance*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001).  But, where there is no relevant extrinsic evidence, or "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted

the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459-60, 889 A.2d 387, 394 (2006); *accord John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010) ("'It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument.'") (quoting *Burroughs Corp. v. Chesapeake Petroleum & Supply Co., Inc.*, 282 Md. 406, 411, 384 A.2d 734, 737 (1978)).

In the absence of any extrinsic evidence that could resolve the ambiguity in the Modification, this case presents, in my view, a classic example of a situation in which an ambiguous contract must be construed against its drafter. The Modification was drafted solely by Wells Fargo. If Wells Fargo wished, it could have included an express provision that its officer's signature was a condition precedent to enforceability of the Modification. However, it did not do so. Moreover, several statements that Wells Fargo did include in the Modification pointed in the other direction: the Modification stated that it would "confirm our formal approval of a loan modification," and simply asked Yacoubou to "sign the enclosed loan modification agreement and return it." Mr. Yacoubou did exactly as he was instructed.

At the hearing on September 27, 2012, I inquired of counsel for Wells Fargo as to what extrinsic evidence Wells Fargo might be able to muster that would create a triable issue as to the meaning of the Modification. Counsel suggested (although Wells Fargo chose not to address this issue in its written motions) that Mr. Yacoubou's acceptance was ineffective because he signed the Modification on November 10, 2008, more than five days after the date that it was issued (November 3, 2008), and the Modification contained the statement: "This proposal is valid for five (5) days from the date of this letter." However, Mr. Yacoubou's unrebutted testimony, at his

deposition, was that he signed the Modification the same day that he received it.  *See* ECF 49-1 at 1-7 (deposition of Mr. Yacoubou).  Clearly, if Mr. Yacoubou did not receive the Modification until November 10, 2008, it would have been impossible for him to sign it on or before November 8, 2008, the fifth day after November 3.[14]  "[W]here impossibility of the performance of [a] condition is known to both the parties at the time of making the agreement there can be no intention of performing it on the one side and no expectation of it being performed on the other." *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 355, 322 A.2d 866, 876 (1974).

In my view, Wells Fargo has failed to present evidence or argument sufficient to create an issue for resolution by a finder of fact.  Construing the Modification against its drafter, as a matter of law, I conclude that the Modification was effective and binding on the parties when Mr. Yacoubou signed it and mailed it to Wells Fargo.  Accordingly, Wells Fargo breached the Modification agreement when it refused to accept Mr. Yacoubou's mortgage payments under the Modification in January and February 2009.  To that extent, Mr. Yacoubou is entitled to summary judgment as to Count I of his complaint.

As to the issue of actual damages, however, I completely agree with Wells Fargo.  "To recover compensatory damages, the amount must be proved with reasonable certainty and may not be based upon speculation or conjecture."  *Brock Bridge Ltd. P'ship v. Dev. Facilitators, Inc.*, 114 Md. App. 144, 157, 689 A.2d 622, 628 (1997).  Plaintiff has advanced no evidence of any quantifiable damages he suffered due to Wells Fargo's breach of the contract.  Indeed, as Wells Fargo points out, he has had possession of the Property since before this suit was filed and has not made any mortgage payments during that time period.  This includes the period

---

[14] Notably, November 8, 2008 was a Saturday.  November 10, 2008 was a Monday.

following the bank's offer, in July 2009, of its willingness to abide by the Modification.   Any damages that Mr. Yacoubou suffered by continuing to litigate the issue after that point were surely self-inflicted.   But, even as to the time period between January and July 2009, plaintiff has not submitted evidence that could substantiate a compensatory damages claim.

Plaintiff's claim appears to be one seeking damages for emotional distress.   Mr. Yacoubou has claimed that incessant collections calls from Wells Fargo caused him sleeplessness and anxiety.   At his deposition, he testified that "fear . . . hits me, the phone becomes like a needle somebody is pointing into my heart.   The phone rings.   It's like, oh no, it's them again.   You pick it up.   Nobody is there.   Just a message."   ECF 49-1 at 120.   However, aside from his own statements regarding his anxiety, he has submitted no evidence (such as documentation of a medical condition or the testimony of others who have observed him) to substantiate that he suffered physical manifestations of injury or that such damages were caused by Wells Fargo's breach.   Indeed, Wells Fargo took a second deposition of Mr. Yacoubou during the period of additional discovery, at which Mr. Yacoubou expressly stated that he did not intend to present any further evidence as to his damages.   *See* ECF 87-4.

At the hearing on September 27, 2012, Mr. Yacoubou spoke eloquently about the frustration he experienced by the lack of "decency" shown by Wells Fargo in refusing to accept his tenders of payment and then initiating foreclosure proceedings against his Property.[15]   Mr. Yacoubou expressed, with a passion that will not be evident on the cold record, his conviction that entities such as Wells Fargo should not "play with other people's life like toys" and treat

---

[15] This Memorandum Opinion was prepared without the benefit of a transcript of the proceedings.   These quotations are drawn from the Court's notes of the proceedings.   If a formal transcript of the hearing is prepared, it will prevail over any inaccuracy in quotation in this opinion.

their customers as "commodities," and that "nobody should be treated like that in America."  He asserted that he was "tortured," in effect, by the defendant.  When asked to provide the Court with a measure of his damages, however, Mr. Yacoubou stated: "You're asking me to quantify my life.  I can't quantify my life.  How much is it worth, my life?  I can't quantify it because that's between me and my creator."

As the Maryland Court of Appeals explained in *Hoffman v. Stamper*, 385 Md. 1, 32-38, 867 A.2d 276, 295-98 (2005), Maryland adheres to the so-called "modern rule" articulated in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979), which permits "recovery of damages for emotional distress if there was at least a 'consequential' physical injury," in the sense that "'the injury for which recovery is sought is capable of objective determination.'"  *Hoffman*, 385 Md. at 34, 867 A.2d at 296 (quoting *Vance*).   This "physical" injury standard permits recovery for "such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs," *id.* at 34-35, 867 A.2d at 296, but excludes recovery "based on the plaintiff simply saying, 'This made me feel bad; this upset me.'"  *Id.* at 34, 867 A.2d at 296.  The Fourth Circuit takes a similar view.  As that Court explained in *Ross v. FDIC*, 625 F.3d 808 (4th Cir. 2010): "[B]ecause 'emotional distress [is] fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims.'  And this is precisely why 'conclusory statements that the plaintiff suffered emotional distress . . . [do not] support[ ] an award of compensatory damages.'"  *Id.* at 818 (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250, 1254 (4th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997)).

To be sure, the Court empathizes with Mr. Yacoubou's frustration.  But, it would be a violation of my oath to decide this case on the basis of sympathy.  The law requires a plaintiff to provide concrete proof of damages for breach of contract, and no such evidence has been presented by Mr. Yacoubou.  Moreover, he has made clear that he does not intend to present such evidence.  Under these circumstances, there is no factual issue for a jury to resolve.  Therefore, I will grant partial summary judgment to Wells Fargo with respect to liability for compensatory damages as to Count I of the complaint.[16]

Nevertheless, in light of Wells Fargo's breach of the Modification, Mr. Yacoubou is entitled to an award of nominal damages.  "[I]t is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001).

Despite its prior concession that Mr. Yacoubou would be entitled to nominal damages if a breach was established, Wells Fargo asserted at the hearing that the doctrine of *damnum absque injuria* would permit the Court to award judgment entirely in Wells Fargo's favor.  The doctrine of *damnum absque injuria* has no application here, however.  The Maryland Court of Appeals explained the doctrine in, among other cases, *Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland*, 342 Md. 169, 194, 674 A.2d 534, 546 (1996) (citation omitted): "'Where the loss to the complaining party was not caused by any breach of legal or equitable duty, it is *damnum absque injuria*.'"  This case does not involve a loss to the plaintiff that was not caused by the breach of a legal duty.  It is the opposite: Wells Fargo breached its legal duty

---

[16] Because I conclude that Mr. Yacoubou has not demonstrated emotional distress damages, I need not resolve Wells Fargo's contention that, as a matter of law, such damages cannot be awarded for a breach of contract in any event.

to Mr. Yacoubou, but he has not established that the breach caused him any quantifiable loss. Maryland law is clear that a breach of contract, in the absence of actual damages, will entitle the plaintiff to nominal damages. *See Taylor*, *supra*, 365 Md. at 175, 776 A.2d at 651; *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 648, 741 A.2d 1099, 1104 (1999) ("'For every breach of a contract, there is a right of recovery of at least nominal damages.'") (quoting *Wlodarek v. Thrift*, 178 Md. 453, 461, 13 A.2d 774, 778 (1940)); *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co.*, 271 Md. 565, 572, 318 A.2d 514, 518 (1974) ("Having implicitly concluded that [defendant] breached the contract, the court proceeded on the incorrect premise that a failure to prove damages compelled a dismissal of the case.  It is firmly established by our prior decisions that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages.  Therefore, the application of this rule alone should have resulted in a denial of the motion to dismiss.") (citations omitted).[17]

In *Brown v. Smith*, 173 Md. App. 459, 920 A.2d 18 (2007), Judge Sally D. Adkins, writing for the Maryland Court of Special Appeals,[18] presented a scholarly and thorough analysis of the permissible amount of a nominal damages award, both under Maryland law and under the laws of other states.  She observed that "some jurisdictions have explicitly fixed the amount that may be awarded as nominal damages," but that "Maryland has no statute, rule, or case law precedent establishing a ceiling on what may be awarded as nominal damages." *Id.* at 480 & n.7, 920 A.2d at 30 & n.7.  Nevertheless, the *Brown* Court stated that "'[n]ominal damages, as the

---

[17] In support of its *damnum absque injuria* argument, Wells Fargo relied upon *Bediako v. American Honda Finance Corp.*, 850 F. Supp. 2d 574, 582 (D. Md. 2012).  In that case, the court cited a Michigan case in which the concept of *damnum absque injuria* was applied to a contract claim.  Regardless of whether *damnum absque injuria* applies to a contract claim under Michigan law, it has no such application under Maryland law.

[18] Judge Adkins is now a member of the Maryland Court of Appeals.

term implies, are in name only,'" and thus, "'[r]ecovery of nominal damages is important not for the amount of the award, but for the fact of the award.' 'Nominal damages are not compensation for loss or injury, but rather recognition of a violation of rights.'" *Id.* at 481, 920 A.2d at 30 (citations omitted). Therefore, "although the amount of nominal damages 'is not limited to one dollar, the nature of the award compels that the amount be minimal.'" *Id.* (citation omitted).

The *Brown* Court reviewed decisions that had overturned, as excessive, nominal damages awards of $15,000, $10,000, $2,500, $1,500, and $530. *See id.* at 30-31, 920 A.2d at 481-82 (citing cases). In the case before it, the *Brown* Court vacated a nominal damages award of $8,350, stating: "[T]o allow more substantial awards to fall within the rubric of nominal damages would vitiate the concept underlying such awards, which is recognition of the violation of a right, not to compensate for actual injury." *Id.* at 482-83, 920 A.2d at 31.[19]

In this case, I conclude that an amount of nominal damages appropriate to recognize "the violation of a right, not to compensate for actual injury," *id.*, is $250. The Court will enter judgment for Mr. Yacoubou in that amount.[20]

An Order implementing my ruling follows.


Date:   September 28, 2012                          /s/
                                                   Ellen Lipton Hollander
                                                   United States District Judge

---

[19] At the hearing on September 27, 2012, counsel for Wells Fargo indicated that he believed an award of $500 in nominal damages would be excessive as a matter of law. This view is consistent with the discussion in *Brown*.

[20] I express no opinion as to the effect of my ruling on Mr. Yacoubou's liability to Wells Fargo for past or future mortgage payments. That issue is not before me.